Russell J. BITTNER by Ella Bittner, his guardian,
Plaintiff-Appellant-Petitioner,

v.

AMERICAN HONDA MOTOR CO., INC., a foreign corpora-
tion, Honda Motor Co., Ltd., a foreign corporation,
Honda Research & Development Co., Ltd.,
Defendants-Respondents,†

DODGE COUNTY, a Wisconsin municipal corporation,
Defendant.

Supreme Court

*No. 91–3067. Oral argument January 12, 1995.—Decided
June 21, 1995.*

(Also reported in 533 N.W.2d 476.)

†Motion for Reconsideration denied·September 11, 1995.

For the plaintiff-appellant-petitioner there were briefs by *Lynn R. Laufenberg, William M. Cannon, Patrick O. Dunphy, Mark L. Thomasen* and *Cannon & Dunphy, S.C.,* Milwaukee and oral argument by *Patrick O. Dunphy.*

For the defendant-respondent there was a brief by *Richard A. Bowman, Wayne D. Struble* and *Bowman & Brooke,* Minneapolis, MN and *Thomas C. Ewing, Bernard J. Bobber* and *Foley & Lardner,* Milwaukee and oral argument by *Wayne D. Struble.*

Amicus curiae brief was filed by *Professor Daniel D. Blinka* and *Marquette Law School* and *Frank A. Scherkenbach, Russell A. Klingaman* and *Hinshaw & Culbertson,* all of Milwaukee, for The Product Liability Advisory Council, Inc.

Amicus curiae brief was filed by *Robert L. Jaskulski* and *Domnitz, Mawicke, Goisman & Rosenberg, S.C.,* Milwaukee, for The Wisconsin Academy of Trial Lawyers.

HEFFERNAN, CHIEF JUSTICE. This is a review of a published decision of the court of appeals, *Bittner v. American Honda Motor Co., Inc.,* 181 Wis. 2d 93, 511 N.W.2d 325 (Ct. App. 1993), which affirmed a judgment of the circuit court for Dodge County, Joseph E. Schultz, Circuit Judge. The judgment, entered on a

jury's verdict in favor of the defendant following a seven week trial, dismissed Russell Bittner's claims against Honda[1] to recover for injuries he sustained when his 1983 three wheel Honda all-terrain vehicle (ATV) overturned.

The sole issue presented on review is whether the circuit court properly admitted Honda's "comparative risk"[2] evidence at trial. Plaintiff objects to the evidence on several grounds: (1) comparing the relative risk of injury of ATVs to other dissimilar products and activities is not legally relevant to the manufacturer's duty of care with regard to the design, manufacture, and sale of ATVs; (2) the injury rate associated with an unrelated product or activity says nothing about the reasonableness of a particular products design; and (3) the introduction of injury rates associated with prod-

---

[1] "Honda" herein, refers collectively to three related but independent defendants: Honda Motor, Co., Inc., Honda Motor Co., Ltd., and Honda Research & Development Co., Ltd.

[2] According to Honda, comparative risk evidence compares the risk of injury associated with various products and activities in order to quantify the relative safety of each. Commentators explain the purpose of comparing the safety of products and activities as follows:

> Putting any risk in perspective requires that it be compared with other risks. The process of comparing risk to other familiar risks makes evaluation easier, especially when decisions regarding the acceptability of other risks have already been made.

*See* T. GLICKMAN & M. GOUGH, *Readings in Risk* 53 (1990).

> The knowledge or risk magnitudes is of little use . . . unless they can be related to the magnitudes of everyday risk, for otherwise no sense is given of the importance of the risks and how much notice should be taken of them.

*See* E. CROUCH & R. WILSON, *Risk Assessment and Comparisons: An Introduction,* 236 Science 267 (Apr. 1987).

ucts wholly unrelated to ATVs misled and confused the jury and impermissibly shifted the jury's focus away from the issues in dispute.

Honda argues that the comparative risk evidence it introduced was appropriate because: (1) plaintiff opened the door by introducing this form of evidence through its own witnesses;[3] (2) comparative risk evidence assists the jury in determining whether a particular product is "reasonably" dangerous; (3) most of the comparative evidence introduced by Honda satisfies the "similar products" test for relevant evidence; and (4) the "dissimilar products" evidence plaintiff objects to pertains to a very limited part of the comparative risk evidence introduced at trial. For the reasons we explain below, we conclude that the evidence introduced by the defendant, comparing the risk of injury associated with three wheel ATVs to the risk of injury associated with dissimilar products and activities, should have been excluded on the basis of relevance, prejudice, and jury confusion. We reverse the decision of the court of appeals, which affirmed the circuit court's evidentiary rulings admitting the comparative risk evidence. On remand, we direct the circuit court to vacate the judgment entered against the plaintiff, Russell Bittner, and to order a new trial on all issues.

## I.

The facts are undisputed. The plaintiff, Russell Bittner, was severely injured in an accident which

---

[3] Honda alleges that plaintiff introduced comparative risk evidence through four of plaintiff's expert witnesses: Edward Karnes, 628 72–74, 81; Charles Benedict, 604, 35–36; Randy Nelson, 621, 65, 69–70; and Jeffrey Houston, 623, 93–94.

Excerpts from the testimony of Edward Karnes and Charles Benedict are provided in the Appendix to this opinion.

occurred while he was operating a 1983 Honda "Big Red" all terrain vehicle near his home on a mowed grass path he had ridden many times before. Bittner, then twenty-six years old, was accompanied by his brother, Robert. The brothers frequently rode their ATVs on this pathway. At the time of the accident Bittner was approximately 50 feet ahead of his brother—he had rounded a corner and was out of his brother's view. When Robert rounded the corner he found his brother lying on the ground about a foot away from his ATV. There were no witnesses to the accident. At trial Robert testified that his brother was an experienced ATV rider.

As a result of the severe and permanent neurological injuries sustained in the accident, plaintiff, by his guardian ad litem, commenced this action. Plaintiff's complaint, based on a theory of product strict liability and common law negligence, alleged that the Honda ATV he was riding at the time of his accident, was defective and unreasonably dangerous and that the defendants were negligent with respect to the vehicle's design and sale. At trial, plaintiff introduced testimony concerning the alleged design defects of three wheel ATVs (with respect to the vehicle's solid rear axle design, the absence of a mechanical suspension system, and its high center of gravity) as well as testimony on how these design features adversely affect ATV handling characteristics. Plaintiff also introduced testimony concerning the results of an investigation conducted by the Consumer Products Safety Commission (CPSC)[4] on the safety of three wheel ATVs. During the course of the testimony related to the CPSC investigation, plaintiff introduced data collected by the

---

[4] The CPSC was explained to the jury by plaintiff's expert William Kitzes, as follows:

CPSC comparing the stability of three wheel ATVs to four wheel ATVs and data reporting injury and fatality rates associated with three wheel ATVs. This evidence was offered to establish that the product was defective and unreasonably dangerous and to establish notice to the manufacturer of the risk associated with three wheel ATVs. Plaintiff informed the jury that ATV-related injury rates were not being offered to establish causation.[5]

Honda argues that plaintiff's "class attack" on the design and safety of three wheel ATVs, "determined the type of product comparisons that Honda could offer in response to the CPSC's injury and death statistics." *Honda's Brief* at 26. Honda argues:

> [O]nce petitioner expanded his defect claim and statistical proof to all 3-wheel ATVs and, in fact,

---

[T]he primary purpose of the Consumer Product Safety Commission is to reduce unreasonable risks of injury to consumers. It's stated that way in the act [Consumer Product Safety Act] under purpose and that's what this system of programs—and ultimately they set up a program specifically for ATV's called the ATV task force, and they are aimed at doing just that, reducing or even, if possible, eliminating unreasonable risks of injury to consumers.

*See Partial Transcript*, August 19, 1991 at 39.

[5] Plaintiff's expert, William Kitzes, explained the nature of ATV injury related statistics compiled by the CPSC, in part, as follows:

Q: [W]ith respect to the NEISS data, can you tell me approximately whether or not it relates to injuries associated with a product or caused by the product, is there a distinction?

A: Absolutely. The NEISS data is intended to collect data associated with the use of the product. The nurses in the emergency rooms are not there to decide what caused any particular injury. It's to give the commission and the country data about injuries associated with the use of the product.

*See Partial Transcript*, August 19, 1991 at 41–42.

132

compared the 3-wheelers to non-ATV products and activities, then the responsive comparative risk analysis could reasonably encompass (1) snowmobiles and mini/trailbikes, which even the CPSC deemed similar to ATVs and (2) motorcycles, cars, bicycles, horseback riding, downhill skiing, and aviation, which even petitioners experts chose to compare to ATV riding.

*Id.* at 27. According to Honda, the comparative risk analyses it introduced, over plaintiff's objections, were an appropriate response to plaintiff's trial strategy. The defense evidence took three forms: 1) a study conducted in 1985 by Dr. Verhalen, Associate Director of Epidemiology for the CPSC, comparing the risk of injury from ATVs with other off-road recreational vehicles including snowmobiles, minibikes and trail bikes; (2) a study conducted in 1988 by Dr. Rodgers, Director of Economics for the CPSC, confirming Dr. Verhalen's study; and, (3) an analysis prepared by Dr. McCarthy for the instant litigation, confirming the work of Drs. Verhalen and Rogers, and an additional comparative study of his own, comparing ATVs to other dissimilar recreational products and activities such as swimming, skiing, boating, bicycling, horseback riding, scuba diving and aviation. These analyses came in on cross-examination of plaintiff's expert, William Kitzes, and on direct examination of Honda's expert, Roger McCarthy.

Because the instant review requires that we consider the evidentiary rulings of the circuit court, it is necessary to set forth in some detail the trial testimony of the two expert witnesses through whom most of the

allegedly objectionable evidence was introduced—William Kitzes and Roger McCarthy.[6]

At trial, through Kitzes, the jury learned that the CPSC had, pursuant to its charter, conducted an investigation on the safety of ATVs. Kitzes explained the various methods the CPSC employed to collect data, including the nationwide hospital emergency room reporting system (NEISS). Kitzes testified that NEISS data associates a particular product with the injury rate reported to the CPSC through NEISS affiliated emergency rooms. Kitzes explained that NEISS data is only associational in nature and that it does not disclose the cause of the accident related to the product.

Through Kitzes, the plaintiff also introduced the results of the CPSC's investigation on the safety of ATVs including the rates of injury and fatality associ-

---

[6]Prior to trial, both parties filed motions *in limine* to exclude evidence and expert testimony. Honda moved the court to exclude plaintiff's expert, William Kitzes, from testifying at trial. The grounds for this motion are not part of the record on review. The plaintiff moved to exclude the comparative risk analysis prepared by Honda's expert, Roger McCarthy, on the grounds that his testimony on this subject would be irrelevant and unduly prejudicial.

The circuit court initially granted Honda's motion to exclude William Kitzes; thereafter, on plaintiff's motion for reconsideration, the court permitted Kitzes to testify but limited the scope of his testimony to "the workings of CPSC" and to the "methodology used by the CPSC in entering consent decrees." *See Rulings On Motions For Reconsideration,* dated August 1, 1991. The court denied, without explanation, plaintiff's motion to exclude McCarthy's comparative risk analysis. Plaintiff's post-verdict motion seeking relief from the jury verdict in part, based on prejudicial error for admitting McCarthy's comparative risk testimony, was similarly denied without explanation.

ated with ATV use. Kitzes testified that as a result of its investigation, the CPSC concluded that three wheel ATVs present a level 3, "imminent risk" of harm. He further testified that this was the highest level of risk the commission might assign a product under its rating system. The jury was told by Kitzes that, once this level of risk is assigned to a product, the United States Department of Justice may begin legal proceedings against the product manufacturer. He further testified that, at the conclusion of the CPSC's investigation on the safety of ATVs, the Department of Justice filed suit against ATV manufacturers, including Honda, to recall three wheel ATVs. And, that after the suit was filed, ATV manufacturers, including Honda, entered into a consent decree with the government agreeing not to sell three wheel ATVs in the United States.

During plaintiff's direct examination of Kitzes, 30 exhibits were offered and received into evidence. With the exception of one exhibit, all the materials introduced through Kitzes exclusively related to three wheel ATVs. Specifically, the exhibits introduced related to CPSC information gathering techniques and internal operating procedures, CPSC memoranda on escalating injury and fatality rates associated with ATVs, CPSC's enforcement policies, written communications from the CPSC to Honda informing Honda of the results of the commission's investigation of three wheel ATVs, CPSC "safety alerts" estimating the number of ATV-related injuries treated in NEISS hospital emergency rooms, CPSC's "Advanced Notice of Proposed Rule Making" (published in the Federal Register), evidence of the suit filed by the Department of Justice against Honda and other ATV manufacturers, and evidence of the consent decree.

135

One exhibit introduced through Kitzes, a report prepared by the Engineering Sciences Staff of the CPSC as part of the commission's task force on ATV safety, compared the tip-over and over-turn rates associated with three wheel and four wheel ATVs.[7] This comparative evidence was offered to establish that Honda had notice that three wheel ATVs were defectively designed. Kitzes read a portion of the Engineering Science report into the record. The report provided in part: "Seventy-four percent of three-wheeled ATV accidents initiated with the ATV tipping or overturning compared to 59 percent for four-wheeled ATV's. This is a statistically significant difference. The stability characteristics of four-wheelers are always higher than those for comparable three-wheelers." *See Partial Transcript of Proceedings,* August 19, 1991 at 159.

On cross examination of Kitzes, Honda introduced a chart published by the CPSC comparing the injury rates associated with snowmobiles, minibikes, trailbikes and ATVs. This chart was the first "other products" evidence introduced at trial.[8] Honda asserts that, because the CPSC classifies snowmobiles,

[7] The Engineering Sciences Report, Exhibit 1136, was received in evidence without objection from Honda. *See Partial Transcript,* August 19, 1991 at 136.

[8] The comparative risk data reflected in this chart, titled "Rates of Injuries Associated with 3 Types of Recreational Vehicles, 1984" (exhibit 1129) was received into evidence over plaintiff's objection to its relevance. *See Partial Transcript,* August 20, 1991 at 36–37.

Prior to Honda's cross-examination of Kitzes, plaintiff's counsel, having reviewed the exhibits Honda intended to introduce through the witness, objected to the introduction of any comparative risk evidence.

minibikes, and trailbikes as products similar to ATVs, the comparative risk evidence reflected in the chart introduced through Kitzes satisfies the similar products test for relevant evidence.

Through Kitzes, Honda also introduced a memorandum and accompanying tables prepared by the Associate Director of Epidemiology for the CPSC, Dr. Verhalen. The memorandum and tables, introduced to impeach the CPSC's statistical analysis on the safety of ATVs, criticized the CPSC conclusion that ATVs were unsafe because, in Dr. Verhalen's opinion, the injury rates relied on by the commission were skewed because they failed to take into account frequency of product use. Through further examination of Kitzes, Honda introduced tables prepared by Dr. Verhalen, comparing the CPSC's unadjusted injury rates for ATVs, minibikes, trailbikes, and snowmobiles with injury rates adjusted for product use. According to Dr. Verhalen's analysis the injury rate for ATVs compared to snowmobiles, minibikes, and trailbikes was dramat-

MR. CANNON: I have asked Mr. Bowman [counsel for Honda] to provide me with copies of the exhibits that he intends to use in the cross-examination of Mr. Kitzes and he has identified a July 15, 1986 memo from Dr. Verhalen to Nick Marchica entitled Snowmobile, ATV, Mini/Trail Bike Comparisons and Comparative Injury Tables, dated June 13, 1986, again, from Dr. Verhalen to Nick Marchica and, for the purposes of the record, I am objecting to both of those documents because I believe that they are legally irrelevant and immaterial to the issues under Wisconsin law with respect to consumer expectation and also because I believe that the CPSC and other documents states that such comparisons are irrelevant and I object to the subject matter being introduced into this lawsuit by cross-examination or in any other manner of its legal irrelevancy and immateriality under Wisconsin law.

THE COURT: Even though they are documents of CPSC?

MR. CANNON: Yes.

*See Partial Transcript,* August 20, 1991 at 36–37.

ically reduced when frequency of use was factored into the equation.

Honda introduced a very different form of comparative risk evidence through direct examination of its own expert, Roger McCarthy. McCarthy compared the risk of injury associated with ATVs to products and activities such as bicycle riding, water skiing, roller skating, scuba diving, and automobiles. Honda asserts that it offered this evidence for several purposes: (1) to rebut the inference that injuries and fatalities associated with ATVs result from the vehicle's design or engineering characteristics; (2) to establish that injury and fatality rates are attributable to the ATV operator; (3) to impeach the statistical analysis underlying the CPSC's ultimate conclusion that ATVs are unsafe by demonstrating that the injury statistics published by the CPSC were skewed because they failed to account for frequency of usage; and (4) to demonstrate that ATV riding is not disproportionately dangerous when compared to other recreational activities and sports.

McCarthy's testimony took three days to complete. During the course of his direct examination, Honda introduced sixty-seven exhibits which were received into evidence.[9] Of these, twenty compared products and activities dissimilar to ATVs and seventeen exhibits compared ATVs to motorized, recreational vehicles such as snowmobiles, minibikes and trail bikes. The remaining 30 exhibits, either dealt exclusively with ATVs or with information relating generally to the

---

[9] We note that Honda's brief states that 67 exhibits were introduced through Roger McCarthy. Our count reflects the following: September 11, 1991, exhibits 2154–2175 (22 exhibits); September 12, 1991, exhibits 2177–2207 (31 exhibits); and September 13, 1991, exhibits 1266–1268, 2208–2220 (17 exhibits).

138

CPSC. Illustrations of McCarthy's comparative risk analysis follow.

During plaintiff's case-in-chief, testimony was introduced to establish that three wheel ATVs were defective and unreasonably dangerous because of their high center of gravity. McCarthy subsequently compared the rollover rate of Corvettes to other passenger vehicles to demonstrate that automobiles with a high center of gravity rollover with less frequency than automobiles, such as the Corvette, with a low center of gravity because the rollover rate is attributable to the driver rather than, as plaintiff's engineer suggested, to the design of the vehicle. This evidence was admitted over plaintiff's objection that no foundation had been laid to suggest that the rollover rate of automobiles can be fairly extrapolated to three wheel ATVs.[10]

McCarthy compared the number of annual injuries associated with skateboards to consumer sales of that

[10] Honda asserts in its brief, that McCarthy's use of automobile rollover rates is not comparative risk evidence per se, because:

> [He] never compared the risk of ATV rollovers against the risk of Corvette or other passenger car rollovers; he simply compared passenger cars against each other to illustrate the comparative risk principle and the general concept that rollover rates do not statistically correlate with vehicle centers of gravity, as petitioner argued.

*See Honda's Brief* at 22 n.8.

Although we recognize a difference between McCarthy's testimony on automobile rollover rates and his testimony comparing the injury rates associated with ATVs with other products and activities, for the purposes of admissibility, if automobile rollover rates cannot be fairly extrapolated to three wheel ATVs, then the principle for which the evidence is offered is irrelevant and must be excluded.

139

product to demonstrate that increased sales correspond to increased injury.[11]

McCarthy testified that there is a risk of injury inherent in all activity. He illustrated this point with a series of charts, several of which compared the annual injury and fatality rates (adjusted for hours of participation) associated with ATVs to sky diving, general aviation, on-road motorcycles, scuba diving, football games, swimming, snowmobiles, skiing, passenger cars, water skiing, and bicycling. Through McCarthy, the jury heard that the risk of death in scuba diving is four times greater than ATV riding; the risk of death is two and one-half times greater in football; that passen-

---

[11] We note that McCarthy made the same point with roller skating.

Honda contends that McCarthy's testimony correlating frequency of use of skateboards and roller skating respectively, with injury statistics, is not comparative risk evidence per se. According to Honda, "McCarthy simply used the injury numbers for these products to illustrate the principle that injury *rates,* not gross injury numbers, more accurately reflect a product's risk." *See Honda's Brief* at 22 n.8.

As noted *supra* n.11, Honda may not introduce evidence establishing a given principle without also establishing that the principle is relevant to one of the legal issues in dispute. If, as Honda asserts, McCarthy simply used roller skating and skate boarding as illustrative of the principle that there is a positive correlation between frequency of use and rate of injury, absent evidence that this principle could be fairly extrapolated to ATVs, it would have no conceivable relevance to the issues in the instant case. Even assuming a proper foundation could be laid, however, the evidence is marginal at best. If the principle is truly applicable to ATVs, then it should be capable of demonstration with figures pertaining to ATVs. There should be no need to even resort to unrelated products and activities which could easily confuse, mislead or distract the jury's attention.

ger cars present a slightly greater risk of death than do ATVs; and that bicycling presents about one-half the risk of death as ATVs, but the rate of injury is slightly higher than for ATV riding. McCarthy characterized as "middling" the relative risk of ATV riding when compared to football, skiing, water skiing, road motorcycles, bicycles, swimming, and general aviation. *See Transcript of Proceedings,* September 12, 1991 at 45. Similarly, he compared ATVs with road motorcycles and snowmobiles and told the jury that the risk of death to the operator is substantially higher for road motorcycles and snowmobiles than for ATVs.

At the conclusion of the trial[12] the jury returned its verdict in favor of Honda, finding: the Honda ATV was neither defective nor unreasonably dangerous; Honda and the plaintiff, Russell Bittner, were both causally negligent; Honda's conduct was not outrageous; Bittner was negligent in failing to wear a helmet at the time of the accident and this negligence caused 8% of his damages or injuries. The jury apportioned liability as follows: Honda 49% negligent, Bittner 51% negligent.[13]

---

[12] The trial began on August 5, 1991 and the jury returned a verdict on September 20, 1991.

[13] In addition to these answers, question 11 of the special verdict asked the jury to determine how much, if any, monetary compensation Bittner should receive. The jury answered as follows:

| | | |
|---|---|---|
| a) | past medical expenses | $ 979,690.40 |
| b) | future medical expenses | $7,125,000.00 |
| c) | loss of past earnings | $ 13,051.00 |
| d) | loss of future earning capacity | $ 200,000.00 |
| e) | past and future pain, suffering and disability | $ 250,000.00 |

During motions after verdict, plaintiff asked the court to change the jury's answers regarding causal negligence or to grant a new trial on numerous grounds, including prejudicial error in admitting McCarthy's comparative risk analyses.[14] By Decision dated November 15, 1991, the court denied plaintiff's motions; plaintiff's evidentiary motion, concerning the admission of Honda's comparative risk analyses, was denied without explanation. The court of appeals affirmed the judgment of the circuit court concluding that plaintiff's decision to introduce injury and fatality statistics associated with ATVs justified the trial court's decision to allow Honda's expert to testify to his comparative risk analysis because the testimony "tended to assist the jury in interpreting" plaintiff's statistics. *Bittner,* 181 Wis. 2d at 112. We granted review.

## II.

Plaintiff objects to Honda's comparative risk evidence on the grounds that it was irrelevant and unfairly prejudicial. With respect to relevance, plaintiff

*See Special Verdict*, filed September 23, 1991 at 3.

[14] Plaintiff's post-verdict motion sought relief from the jury verdict on the following grounds: (1) because the verdict violated the "five-sixths" rule set forth in sec. 805.09, Stats.; (2) juror misconduct; (3) prejudicial error in the submission of certain jury instructions; (4) prejudicial error in certain evidentiary rulings; (5) the jury's verdict on causal negligence and past and future pain and suffering is against the great weight of the evidence; (6) the jury's verdict on past pain and suffering is perverse; and (7) in the interests of justice. *See Plaintiff's Brief In Support of Motions After Verdict,* filed October 2, 1991.

142

contends that this form of evidence has no place in product liability claims whether based on a theory of strict liability or common law negligence because: (1) the injury rate associated with an unrelated product or activity says nothing about the reasonableness of a particular products design; and (2) because the test of "unreasonably dangerous" is not "how risky" the product is compared to other products but, rather, whether the product at issue is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it.[15] With respect to prejudice, plaintiff contends that injury rates associated with products wholly unrelated to ATVs misled and confused the jury and impermissibly shifted the jury's focus away from the issues in dispute.

---

[15] Plaintiff raises a similar objection to using comparative risk evidence in claims for negligence. Plaintiff points out that there are a finite number of duties imposed on product manufacturers which permit recovery based on negligence. These include: (1) the duty to refrain from any act which will cause foreseeable harm to others; (2) the duty to make all reasonable and adequate tests and inspections of the product to guard against any defective condition which would render it unsafe when used for its intended purpose; (3) a duty to warn if the manufacturer has or should have knowledge of a dangerous use; and (4) a duty to warn of dangers inherent in the product in a use not intended if such unintended use is reasonably foreseeable by the manufacturer. The plaintiff points out that the rate of injury associated with football and swimming do not tell a reasonable ATV manufacturer which type of suspension to use to minimize accidents and reduce the risk of foreseeable harm to the user; nor do the rates of injury and fatality associated with passenger cars or general aviation inform a reasonable manufacturer whether its product presents an inherent danger of which the user should be warned.

Plaintiff asks this court to exclude comparative risk evidence by application of the rules used to admit or preclude "other accident" evidence in product liability cases. The rule we follow with regard to "other accidents" admits evidence of other accidents or similar occurrences under similar conditions and circumstances to show the probability of the defect in question. *Netzel v. State Sand & Gravel Co.,* 51 Wis. 2d 1, 9, 186 N.W.2d 258 (1971) *(citing* with approval 1 JONES, EVIDENCE (5th ed.), sec. 185, p. 323). The assumption underlying the rule is that similarity of product and similarity of circumstance renders the comparison probative of the material issues in dispute. In the instant case, however, the comparative risk evidence introduced by Honda, comparing ATVs to dissimilar products and activities, could not be used to disprove product defect. Therefore, it would be inappropriate to apply the line of cases which developed the "prior accidents" rule for relevant evidence to comparative risk evidence per se. We nonetheless conclude, however, that the operative assumption underlying the rule, i.e., that similarity of product and circumstance renders the comparison probative, should similarly inform a court's determination of whether comparative risk evidence is admissible for another relevant purpose. For instance, plaintiff's use of CPSC data comparing the accident rates of three and four wheel ATVs—data reflecting a lower accident rate for four wheel ATVs—was relevant to establishing that Honda might reasonably have designed a safer vehicle. Comparing three and four wheel ATVs is appropriate because these products, although different in design, are intended for a similar purpose.

Plaintiff also argues that introducing data collected by the CPSC on injury and fatality rates associated with ATVs did not "open the door" to Honda's comparative risk evidence. Plaintiff asserts this data was properly introduced to demonstrate that Honda had notice that its product was defectively designed. Plaintiff contends that, although one of his exhibits included comparative injury rates comparing ATVs to similar products (e.g., snowmobiles, mini and trailbikes)[16] the comparative data, although favorable to his case, was never read to the jury.[17] Plaintiff points out that all the comparative injury evidence involving "dissimilar products" was introduced by Honda during its cross-examination of William Kitzes or its direct examination of Roger McCarthy, and, then, over plaintiff's objection. Accordingly, plaintiff contends that he did not, as found by the court of appeals, "open the door" to Honda's comparative risk analyses.

According to Honda, if Bittner had limited his product defect claim and his statistical proof to the vehicle model he was riding at the time of his accident, then "the court might have reasonably limited Honda's comparative risk analysis to just 3-wheel ATVs." *See Honda's Brief* at 27. To the extent plaintiff's experts compared ATV riding to "non-ATV products and activities," Honda asserts that its "responsive comparative risk analysis could reasonably encompass. . . .

---

[16] Plaintiff refers to Exhibits 1121 and 1129.

[17] According to plaintiff, the favorable comparative risk data he did not read to the jury on direct examination of William Kitzes, data published in the Federal Register, provided as follows: "The rate of injuries associated with ATVs were nearly double those for minibikes and trail bikes and more than eight times those for snow-mobiles." *See Plaintiff's brief* at 38.

motorcycles, cars, bicycles, horseback riding, downhill skiing, and aviation." *Id.*

In addition, Honda contends that comparative risk evidence assists the trier of fact by providing context to the risk comparison because, "[o]nly by comparison to the 'basic risk' does the 'special risk' assume some context that permits us to evaluate the real risk . . .." Honda argues that the testimony of its witness, McCarthy, "provided the jury with precisely that type of context for ATV usage . . . [he] limited the 'basic risk' to the same category of products and activities as the 'special risk' so that the jury could evaluate the risk of ATV usage in terms of the ordinary consumer's choice among recreational risks." *See Honda's Brief* at 6.

Finally, Honda contends that McCarthy's analysis was particularly relevant (1) to rebut the inference that the injuries and fatalities associated with ATVs resulted from the vehicle's design; (2) to prove that ATV-related accidents are attributable to the vehicle operator; (3) to prove that the injury and fatality statistics published by the CPSC were skewed because they failed to account for product usage; (4) to demonstrate that ATV riding is not disproportionately dangerous when compared to other recreational activities and sports; and (5) to assist the trier of fact in interpreting the injury statistics introduced by the plaintiff and to obviate the danger that the jury would conclude that ATVs must be defective and dangerous merely because of the number of injuries and death associated with ATV use.

## III.

In reviewing evidentiary issues, the question on appeal is "whether the trial court exercised its discre-

tion in accordance with accepted legal standards and in accordance with the facts of record." *State v. Wollman,* 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). In the instant case, the record indicates that, while the circuit court denied each of plaintiff's motions after verdict, it failed to provide any explanation for its conclusion that the comparative risk testimony put in evidence by Honda was relevant or that its probative value outweighed its prejudicial effect. "The failure of the trial court to set forth its reasoning requires us to independently review the evidence to determine whether it supports the trial court's decision." *State v. Alsteen,* 108 Wis. 2d 723, 728, 324 N.W.2d 426 (1982).

To be properly admissible comparative risk evidence must satisfy a two-prong test. The first prong requires the court to determine whether the evidence is relevant, i.e., has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would without the evidence." Section 904.01, Stats. Any fact which tends to prove a material issue is relevant. *Rogers v. State,* 93 Wis. 2d 682, 688, 287 N.W.2d 774 (1980). Conversely, evidence which does not have a tendency to prove any fact that is of consequence to a material issue in the case is irrelevant. Evidence that is not relevant is not admissible—as a matter of law, a judge has no discretion to admit irrelevant evidence. Section. 904.02, Stats.

Under the second prong, the court must exercise its discretion to determine whether any prejudice resulting from the admission even of relevant evidence substantially outweighs its probative value. Section 904.03, Stats. Evidence is unfairly prejudicial if it has a

147

tendency to influence the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise causes the jury to base its decision on something other than established propositions in the case. *Lease America Corp. v. Insurance Co. of North America,* 88 Wis. 2d 395, 401, 276 N.W.2d 767 (1979).

Plaintiff's product liability action is based on two theories: negligence and strict liability. The test for negligence is whether the conduct foreseeably creates an unreasonable risk to others. *Morgan v. Pennsylvania General Insurance Company,* 87 Wis. 2d 723, 732, 275 N.W.2d 660 (1979) *(citing Christensen v. Economy Fire & Casualty Co.,* 77 Wis. 2d 50, 61, 61 n.11, 252 N.W.2d 81 (1977)). In a claim for strict liability the plaintiff must prove: (1) the product was in a defective condition when it left the possession or control of the seller, (2) it was unreasonably dangerous to the user or consumer, (3) the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) the seller engaged in the business of selling such product, or that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when sold. *Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967). We apply the two-prong test to determine the admissibility of the comparative risk evidence in light of the elements of proof required to establish plaintiff's claims for negligence and strict liability.

On review, we consider three discrete forms of comparative risk evidence introduced at trial: (1) the CPSC data comparing injury rates associated with

ATVs and other off-road motorized vehicles; (2) a memorandum and tables prepared by Dr. Verhalen comparing injury rates, adjusted for frequency of use, associated with ATVs and other off-road motorized vehicles; and (3) the comparative risk analysis introduced by Honda through its expert witness, Roger McCarthy, comparing the injury and fatality rates associated with ATVs to other dissimilar products and activities.

We first consider whether the evidence introduced on cross-examination of plaintiff's expert, William Kitzes, satisfied the test of relevance, i.e., had any tendency to make a material fact more or less probable. On cross examination of Kitzes, Honda introduced a chart published by the CPSC comparing the injury rates associated with snowmobiles, minibikes and trailbikes and ATVs. The chart demonstrated that injuries per 1,000 vehicles in use were higher for ATVs than for the other motorized off-road vehicles. There is no dispute that the CPSC considered snowmobiles, minibikes and trailbikes to be similar to ATVs for the purposes of comparing the relative safety of each. We conclude, that although differing in design, each of these products—snowmobiles, minibikes, trailbikes and ATVs—is intended for a similar purpose, and, therefore, that the comparative evidence was probative of Honda's assertion that ATV-related accidents are attributable to the vehicle operator; and, that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. From this evidence the jury might also have inferred that the ATV was neither defective nor unreasonably dangerous or that Honda reasonably designed a safe vehicle.

149

On further cross-examination of plaintiff's expert witness, William Kitzes, Honda also introduced a memorandum and tables prepared by Dr. Verhalen, comparing the risk of injury associated with ATVs to the risk of injury associated with other motorized, recreational vehicles including snowmobiles, trailbikes, and minibikes. Subsequently, during Honda's case-in-chief, its expert, Roger McCarthy, testified that the data used by Dr. Verhalen was compiled by the commission as part of its usual investigative and information gathering procedures. He further testified that the CPSC provided the comparative risk data to Honda. We conclude that the circuit court properly admitted Honda's comparative risk analysis, prepared by Dr. Verhalen, for the purposes of impeaching the CPSC's statistical analysis by demonstrating that the CPSC's statistical basis, relied on by the plaintiff, could be defective because it failed to account for frequency of product use; that the probative value of the evidence for impeachment was not substantially outweighed by the danger of unfair prejudice; but that plaintiff was entitled, upon request, sec. 901.06, Stats, to an instruction limiting the use of the comparative evidence to the permissible purpose, i.e., impeachment. From this evidence the jury might have concluded that the commission misjudged the relative dangerousness of ATVs and erroneously concluded that they presented an imminent risk of harm to consumers.

The third form of comparative risk evidence was also introduced by Honda, through its expert witness, Roger McCarthy. McCarthy compared the risk of injury and death associated with ATVs to the risk of injury and death associated with products and activi-

150

ties including skiing, bicycle riding, scuba diving, football, and passenger automobiles. Honda argues that plaintiff opened the door to this form of evidence and that the evidence was necessary to provide the jury with a perspective on what constitutes a "reasonable" risk of danger. According to Honda, if fewer individuals are injured riding ATVs than, for instance, playing football, then the risk of injury associated with ATV riding is reasonable. While this may be true, it is not relevant. We conclude that the safety of ATV riding, compared to dissimilar modes of recreation or transportation, is not an issue in dispute. Accordingly, the comparative risk evidence comparing ATV riding with dissimilar products and activities, such as sky diving, cannot be introduced, as Honda asserts, to demonstrate that ATVs are not unreasonably dangerous. Further, we agree with plaintiff's assertion that the consumer's choice to enjoy a particular product or activity has no relevance to the manufacturer's duty of care with regard to the design, manufacture, or sale of its particular product. These duties persist whether or not the product has a high rate of injury associated with it. We point out, however, that the defense might, in some instances, benefit from a high rate of injury associated with the particular product involved because this might be evidence to infer plaintiff's contributory negligence. In Wisconsin, contributory negligence is an affirmative defense available to the product manufacturer whether the cause of action is based on common law negligence or a theory of strict liability. *Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967).

Similarly, the defendant may use plaintiff's evidence of prior accidents to its advantage. For instance:

[I]n a case where the plaintiff has proven that there were five other accidents involving the same or substantially similar products, defense counsel should do his homework and establish that although six persons, including the plaintiff, have been injured, the product has been in the marketplace for twenty years, involved the sale of 15,000 machines and was used for about four million man-hours. Thus, defense counsel can take the plaintiff's own proof and use it to establish the reasonableness of the design of the product.

See DRI PRODUCTS LIABILITY TRIAL NOTEBOOK, *Presence or Absence of Prior or Subsequent Accidents,* at 66. Indeed, Honda introduced frequency of use evidence in part, to demonstrate that three wheel ATVs were neither defective nor unreasonably dangerous because the propensity for injury was greatly reduced when frequency of use was factored into the equation.

Furthermore, we think a product manufacturer has ample opportunity to defend itself without resort to evidence comparing the relative risk of injury associated with the product at issue to dissimilar products. We suggested a number of possible defenses to product liability claims in *Dippel v. Sciano:*

Defenses among others that suggest themselves are that the product must be reasonably used for the purpose for which it was intended; abuse or alteration of the product may relieve or limit liability, some products just naturally wear out in such a manner as to render them unsafe and as to others, the intended use can be coupled with inherent danger—anyone can cut his finger with a sharp knife or puncture it with a fishhook, and teeth can be damaged by the sugar in the consumption of soft drinks.

*Dippel,* 37 Wis. 2d at 460.

Finally, plaintiff contends, and we agree, that "[i]t requires a monumental and unsupportable leap of 'logic' to justify the admission of comparative risk evidence by reference to the . . . testimony of Russell's experts." *See Plaintiff's Reply Brief* at 3. As the evidence here demonstrates, no door was opened by the plaintiff because all the comparative risk evidence comparing ATVs to other products was introduced by Honda. The assertion that the testimony of plaintiff's experts, such as it was, *see Appendix,* opened the door to 37 of the 70 exhibits Honda introduced through its own expert, Roger McCarthy—exhibits comparing the risk of injury or death associated with ATVs to (a) other motorized off-road vehicles or (b) products and activities such as sky diving, general aviation, football and swimming—is unfounded. Further, the evidence Honda points to as having opened the door, is not comparative risk evidence as that term has been defined by Honda because it did not compare the risks inherent in various activities per se, for the purpose of quantifying the relative safety of each. *See Honda's Brief* at 10–11 and *see Appendix*.

We conclude that the circuit court erred in admitting evidence comparing the risk of injury associated with ATVs to dissimilar and unrelated products and activities because the evidence had no tendency to make the material issues in this negligence and strict liability action more or less probable. This form of comparative risk evidence was irrelevant and, hence, not within the judge's discretion to admit.

Based on our examination of the record, we further conclude that, contrary to Honda's assertion at oral argument, more than passing reference was made at trial to its comparative risk evidence. All the irrelevant

comparative risk evidence was introduced through Honda's witness, Roger McCarthy; McCarthy's direct examination occupied almost three full days of the trial; through McCarthy, Honda introduced 37 charts with comparative injury and fatality statistics, 20 of which concerned products and activities dissimilar to the product at issue in this product liability action. None of the 20 exhibits were relevant to disproving plaintiff's claims that three wheel ATVs are defective or unreasonably dangerous, or, that Honda breached its duty of care with regard to the design, manufacture, and sale of the ATV in question. In closing argument Honda told the jury that the 40 or 50 exhibits (introduced through McCarthy) took years for McCarthy and his staff to prepare at "millions of dollars of cost." *See Partial Transcript,* September 18, 1991, at 45. Honda characterized McCarthy's statistical analyses as "virtually unrebutted," "uncontested" and "squeaky clean." *Id.* at 47. Honda improperly argued to the jury that McCarthy's comparative risk analysis, involving dissimilar products and activities, could be used to infer that the product at issue, a Honda three-wheel ATV, is reasonably safe. *Id.*

For these reasons we conclude that the irrelevant, nonprobative evidence comparing ATVs to products and activities unrelated in design or purpose was likely to have confused the jury. Our examination of the instant record compels the conclusion that the jury could not reach the appropriate verdict because they were deluged by irrelevant evidence that many other recreational products and activities are more dangerous than ATV riding. Accordingly, with the "strong belief that the issues [have] not been fully tried nor justice done," *State v. Harp,* 161 Wis. 2d 773, 782, 469

154

N.W.2d 210 (Ct. App. 1991) *(citing Vollmer v. Luety,* 156 Wis. 2d 1, 21, 456 N.W.2d 797 (1990), we order a new trial in the interest of justice, sec. 751.06, Stats.[18]

Accordingly, we reverse the decision of the court of appeals, and remand the cause to the circuit court with directions to vacate the judgment entered against the plaintiff, Russell Bittner, and to order a new trial on all issues.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

## APPENDIX

Honda alleges that the plaintiff opened the door to comparative risk evidence through Edward Karnes, Charles Benedict, Randy Nelson and Jeffrey Houston. We examined the testimony of each of these witnesses and conclude that Honda is mistaken. Excerpts from the testimony of Karnes and Benedict are provided below.

Karnes testified as follows:

---

[18] Section 751.06, Stats., provides:

**Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleading and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

155

Q: Dr., You're familiar with a position that rider would have to place himself in in order to turn this vehicle? ·

[Honda]: Objection, cumulative.

The Court: Overruled.

A: Yes.

Q: All right. From a human factors standpoint, Dr.—Well, first of all, Dr., if I wanted to make a left turn on my Big Red 200E and I am going 15 to 20 miles an hour, because it doesn't have a differential, how—what type of body positions, in light of that lack of differential and in light of the high center of gravity and the narrow wheel base—excuse me, narrow track and short wheel base, what kind of position do I have to put myself into?

A: Well, depends a little bit on the specific terrain surface that you are riding on but, in general, for almost all of the terrain surfaces you have got to put yourself in a position whereby the body is leaned into the turn but the weight is supported on the outside foot peg. That's something that's almost impossible to do if you think about it physically. What it really means, I believe, is that you have to get your weight to the outside of the turn somewhat to get that inside wheel to release so it slips a little bit. In other words, you become the differential. . . .

Q: In fact, you have learned that through your operation in the SVIA course that you took?

A: Yes.

Q: Do you have an opinion, Dr., to a reasonable degree of certainty in your field of human factors that these weight shifts and body movement in a turn are complex and unnatural for the human—

156

[Honda]: Objection, lack of foundation, cumulative.

The Court: Overruled. It's tending to be little cumulative.

A: I believe they are quite complex and what I'd call counter-intuitive. I just don't think they fit with what we would expect as based on your experience on other vehicles.

Q: For example, when you want to turn a car, what one input is necessary for the human being?

A: With a car you simply turn the handle—the—I say handlebar. It's a steering wheel. With a car you turn the steering wheel.

Q: And a motorcycle or bicycle, what's the one human input that's required?

A: The basic input is essentially, leaning, turning slightly the handlebars, but essentially just leaning, one input.

Q: And with the ATV it requires multiple inputs?

A: At least two, yes, turning the handlebars and shifting the body in a very specific way.

. . .

Q: How many years have you been skiing?

A: I don't know, um, forty.

Q: Forty. Would you analogize for the jury whether the movements you do when you downhill ski are the same type of movements you do when you turn an ATV?

A: Absolutely not, quite different, as a matter of fact. There are some similarities in weight shifts, but the differences are much greater than any similarities.

Q: Dr., do you have an opinion to a reasonable degree of certainty in your field as to whether the Honda ATV, in general, and the 200E, in particular, the models that you are familiar with, have a deceptive appearance of stability?

> [Honda]: Object to the question on the grounds that it calls for ATV's in general. It doesn't focus on this 1983 Big Red.

> [Plaintiff]: Your Honor, I can go back and cover another area as foundation.

> The Court: okay.

*See Partial Trial Transcript,* August 21, 1991 at 71–75.

Reading Karnes' testimony in context indicates that the other activities were referred to for the purposes of illustrating operator control over the vehicle in order to provide jurors with a point of reference to understand the driver inputs and weight shifts necessary to steer an ATV.

The testimony of plaintiff's expert, Edward Benedict, had a similar purpose. Benedict explained the difficulties of steering an ATV, in part, as follows:

> The inherent characteristics are that you have to do something unnatural to make it turn, you know, in the sense that all of our lives we learn that when we go left we lean left on a bicycle, motorcycle, a horse running, a car, all vehicles that we have ever been in with. In this vehicle in particular, you lean into the curve and to make something like that do something unnatural like a bicycle or motorcycle or a car, if you want it to do something unnatural, you have to make it do something unnatural . . .

*See Partial Trial Transcript,* August 15, 1991 at 35–36.