Ruben Baez Godoy, a minor, by his guardian
ad litem, Susan M. Gramling,
Plaintiff-Appellant-Petitioner,

v.

E.I. du Pont de Nemours and Company,
The Sherwin-Williams Company, American
Cyanamid Company, Armstrong Containers,
Defendants-Respondents,

Walter Stankowski, Wayne Stankowski and
Wisconsin Electric Power Company, Defendants,

Acuity, Intervenor-Defendant.

Supreme Court

*No. 2006AP2670. Oral argument September 10, 2008.
—Decided July 14, 2009.*

2009 WI 78

(Also reported in 768 N.W.2d 674.)

94

For the plaintiff-appellant-petitioner there were briefs by *Peter G. Earle* and *the Law Offices of Peter Earle, LLC,* Milwaukee; and *Jonathan D. Orent, Fidelma Fitzpatrick,* and *Motley Rice, LLC,* Providence, R.I., and oral argument was by *Peter G. Earle* and *Fidelma Fitzpatrick.*

For the defendants-respondents E.I. du Pont de Nemours & Company, The Sherwin-Williams Company, and Armstrong Containers, Incorporated, there were

briefs by *Paul E. Benson, Nathaniel Cade, Jr.,* and *Michael Best & Friedrich LLP,* Milwaukee; *Steven R. Williams, Joy C. Fuhr, R. Trent Taylor,* and *McGuire Woods LLP,* Richmond, Va.; *Timothy A. Bascom* and *Bascom, Budish & Ceman, S.C.,* Wauwatosa; *Robert P. Alpert, Jeffrey K. Douglass,* and *Morris, Manning & Martin, LLP,* Atlanta, Ga.; *Jeffrey K. Spoerk, Christopher G. Meadows, Cheri L. Baden,* and *Quarles & Brady LLP,* Milwaukee; and *Robert S. Walker, Laura A. Meaden, Rebekah B. Kcehowski,* and *Jones Day,* Pittsburgh, Pa., and oral argument by *Joy C. Fuhr.*

For the defendant-respondent American Cyanamid Company, there was a brief by *Richard W. Mark, Elyse D. Echtman,* and *Orrick, Herrington & Sutcliffe, LLP,* New York, N.Y.; and *Ralph A. Weber, Beth Ertmatinger Hanan, Daniel S. Elger,* and *Gass Weber Mullins LLC,* Milwaukee, and oral argument by *Richard W. Mark.*

An amicus curiae brief was filed by *Stephanie A. Scharf, Sarah R. Marmor,* and *Schoeman, Updike, Kaufman & Scharf,* Chicago, Ill.; and *Colleen D. Ball,* Wauwatosa, on behalf of The Product Liability Advisory Council.

An amicus curiae brief was filed by *R. George Burnett,* and *Liebmann, Conway, Olejniczak & Jerry SC,* Green Bay, on behalf of Miller Brewing Company, S.C. Johnson & Son, Wisconsin Knife Works, Midwest Food Processors Association, and Wisconsin Dairy Business Association.

An amicus curiae brief was filed by *James A. Pelish* and *Thrasher, Pelish, Franti & Smith Ltd.,* Rice Lake, on behalf of the Civil Trial Counsel of Wisconsin and The Metropolitan Milwaukee Association of Commerce.

An amicus curiae brief was filed by *Gregory B. Conway* and *Liebmann, Conway, Olejniczak & Jerry SC,* Green Bay, on behalf of Hydrite Chemical Co.

An amicus curiae brief was filed by *Rhonda L. Lanford* and *Habush Habush & Rottier S.C.,* Madison, on behalf of the Wisconsin Association for Justice.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Ruben Baez Godoy, seeks review of a published court of appeals decision affirming the circuit court's order dismissing his defective design claims in strict liability and negligence against manufacturers of white lead carbonate pigment.[1] The issue presented here is whether the circuit court correctly concluded that Godoy's complaint failed to state a claim of defective design where (1) the product is white lead carbonate pigment; (2) the alleged design defect is the presence of lead; and (3) the defendant manufacturers were manufacturers of white lead carbonate pigment.

¶ 2. We determine that the circuit court correctly concluded that the complaint failed to state claims of defective design. A claim for defective design cannot be maintained here where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself. Without lead, there can be no white lead carbonate pigment. We therefore conclude that the complaint fails to allege a design feature that makes the design of white lead carbonate pigment defective. Accordingly, albeit with some clarification of the rationale, we affirm the court of appeals.[2]

---

[1] *See Godoy ex rel. v. E.I. du Pont de Nemours & Co.,* 2007 WI App 239, 306 Wis. 2d 226, 743 N.W.2d 159, affirming a non-final order of the circuit court for Milwaukee County, Francis T. Wasielewski, Judge.

[2] Godoy filed suit under theories of strict liability and negligence. Our opinion today addresses only the defective design claims. Other claims remain pending at the circuit court and are not affected by this interlocutory appeal.

¶ 3. This is a review of the circuit court's dismissal of design defect claims. Therefore, all facts and allegations in the complaint are presumed to be true. These facts are primarily taken from Godoy's first amended complaint.[3]

¶ 4. Ruben Baez Godoy is a minor child who grew up in Milwaukee, Wisconsin. When he was approximately one year old, he lived in an apartment at 1502 West Windlake Avenue. The surfaces of the apartment had been coated with paint containing white lead carbonate pigment.

¶ 5. Beginning in March of 1998 and for the duration of his tenancy, Godoy sustained lead poisoning. The source of the lead poisoning was white lead carbonate pigment derived from painted surfaces, paint chips, paint flakes, and dust containing paint in his apartment.

¶ 6. The defendants in this case include E.I. du Pont de Nemours and Company, Armstrong Containers, the Sherwin-Williams Company, and American Cyanamid (collectively, "manufacturer defendants"). These defendants designed, manufactured, processed, marketed, promoted, supplied, distributed and/or sold white lead carbonate products used as a pigment in paints and coatings for residential use. Godoy alleged that the intended purpose of white lead carbonate pigment was as an ingredient in paint. Godoy is unable

---

[3] The defendant manufacturers filed the motion to dismiss in response to Godoy's first amended complaint. Godoy subsequently filed a second amended complaint adding party defendants. However, the substantive allegations remained unchanged.

to identify the particular manufacturer of the white lead carbonate pigment present in the apartment.

¶ 7. Ingesting white lead carbonate pigment, like other products containing lead, can cause severe and permanent injuries including learning disabilities, decreased intelligence, deficits in neurophsychological functioning, coma, seizure, and death. By the second half of the twentieth century, manufacturers and members of the scientific community acknowledged that lead is hazardous to human health and that children could get lead poisoning through exposure to paint containing lead. Godoy alleges that the manufacturer defendants nonetheless promoted the use of white lead carbonate pigment in residential paints, marketing it as a safe product that fostered health and well-being.

¶ 8. Godoy filed suit alleging, among other things, that white lead carbonate pigment is defectively designed and that the defendant manufacturers are liable under theories of strict liability and negligence. Although three of the manufacturer defendants designed and manufactured paint in addition to white lead carbonate pigment, Godoy filed suit against them in the capacity of white lead carbonate pigment manufacturers, not in the capacity of paint manufacturers.[4]

¶ 9. The manufacturer defendants responded by filing a motion to dismiss the defective design claims. They argued that Godoy did not identify a legally cognizable design defect in white lead carbonate pigment and that, as a result, his complaint failed to state design defect claims upon which relief could be

---

[4] American Cyanamid is the only defendant white lead carbonate manufacturer that did not also manufacture paint. For further discussion, see Part III.B below.

granted.[5] The circuit court dismissed the design defect claims, concluding that "lead is an inherent characteristic of white lead carbonate," and that white lead carbonate pigment cannot be designed without lead.

¶ 10. Godoy was granted permission to file an interlocutory appeal. The court of appeals affirmed the order of the circuit court, determining that a product cannot be said to be defectively designed when that design is inherent in the nature of the product so that an alternative design would make the product something else. *See Godoy ex rel. v. E.I. du Pont de Nemours & Co.,* 2007 WI App 239, ¶¶ 4, 8, 306 Wis. 2d 226, 743 N.W.2d 159.

¶ 11. In its analysis, the court noted that Wisconsin has neither accepted nor rejected the Restatement (Third) of Torts: Product Liability. *Id.,* ¶ 8. Nonetheless, the opinion stated that the Restatement (Third) could "illumine" its inquiry. *Id.* The court quoted the definition of design defect from the Restatement (Third), and then applied the facts to that definition. *Id.* Unlike Wisconsin law, the Restatement (Third) requires proof of a reasonable alternative design in design defect cases. *Id.* Noting that "there is no 'alternative design' to make white-lead carbonate without using lead," the court concluded that the Restatement (Third) "does not sanction imposing liability on the defendants." *Id.*

---

[5] In the memorandum in support of the motion to dismiss, the defendants advanced that "[t]o the extent that Plaintiff's claims rest on an allegation of a design defect, they should be dismissed because white lead carbonate is, by definition, made of lead, and can be made no other way. . . . A design defect claim aimed at a product such as white lead carbonate is not a complaint about a defect in the design of the product. It is, rather, a complaint that it should be a different product altogether."

¶ 12. Whether a complaint states a claim upon which relief can be granted is a question of law, which we review independently of the determinations rendered by the circuit court and the court of appeals. *John Doe 1 v. Archdiocese of Milwaukee,* 2007 WI 95, ¶ 12, 303 Wis. 2d 34, 734 N.W.2d 827. A motion to dismiss tests the legal sufficiency of the claim. *Id.* We accept as true both the facts in the complaint and the reasonable inferences that may be drawn from such facts. *Id.*

¶ 13. We construe the allegations liberally in favor of stating a cause of action. *Id.* However, legal inferences and unreasonable inferences need not be accepted as true. *Id.*; *Morgan v. Pa. Gen. Ins. Co.,* 87 Wis. 2d 723, 731, 275 N.W.2d 660 (1979). A claim will not be dismissed as legally insufficient unless it appears certain that the plaintiff cannot recover under any circumstances. *John Doe 1,* 303 Wis. 2d 34, ¶ 12.

III

¶ 14. In order to provide context to our analysis and focus to our inquiry, we initially embark on two threshold areas: (a) an overview of the development of our strict liability jurisprudence; and (b) a determination of the product at issue in this case.

A

¶ 15. Products liability law involves complex and continually evolving concepts regarding a manufacturer's responsibility for providing safe con-

sumer products.[6] Less than a century ago, products liability jurisprudence was firmly rooted in contract law, which frustrated recovery for many injured consumers. *See generally* David G. Owen, *The Evolution of Products Liability Law,* 26 Rev. Litig. 955 (2007). Manufacturers of defective products could claim lack of 'privity of contract' as a near-absolute defense to liability. *Id.* at 961–64. By mid-century, courts began to respond to "ever-growing pressure for protection of the consumer." *Id.* at 966 (*quoting* Fleming James, Jr., *Products Liability,* 34 Tex. L. Rev. 44, 44 (1955)). In 1963, the landmark case *Greenman v. Yuba Power Products, Inc.,* 377 P.2d 897 (Cal. 1963), declared that manufacturers of defective products could be held strictly liable in tort.

¶ 16. Shortly thereafter, the American Law Institute introduced the Restatement (Second) of Torts, which included for the first time "Special Liability of Seller of Product for Physical Harm to User or Consumer." *See* Restatement (Second) of Torts § 402A (1965). This section created a new rule of strict liability, holding sellers of defective products liable for defective products even if "the seller has exercised all possible care in the preparation and sale of [the] product." *Id.* § 402A(2)(a); *see also id.* cmt. a. The intended effect was to prevent manufacturers, who were in the best position to ensure the quality of their wares, from invoking inapt contract law defenses. Manufacturers could be held strictly liable for a product defect even if they were not negligent. Two years later, Wisconsin embraced

---

[6] For an extensive discussion of the history of products liability, see David G. Owen, *The Evolution of Products Liability Law,* 26 Rev. Litig. 955 (2007) *and* Richard W. Wright, *The Principles of Product Liability,* 26 Rev. Litig. 1067 (2007).

Section 402A and strict liability[7] in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967).

¶ 17. By the 1990s, some commentators believed that it was necessary to revise the restatement to

[7] The Restatement (Second) of Torts § 402A clarified that strict liability "does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved." *Id.* cmt. a. Our cases explain that negligence and strict liability are separate avenues of recovery. *Morden v. Cont'l AG,* 2000 WI 51, ¶ 42, 235 Wis. 2d 325, 611 N.W.2d 659. Both causes of action require a plaintiff to prove that the product causing injury was "defective." *See* Wis. JI—Civil 3200. However, the elements of negligence and strict liability claims are substantively different. A determination that a manufacturer is strictly liable for a defect is "completely independent of and irrelevant to" a determination that a defect was caused by the manufacturer's negligence. *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 414, 331 N.W.2d 585 (1983).

Strict liability is based on Restatement (Second) of Torts § 402A and focuses on the nature of the defendant's product, whereas liability in negligence "hinges in large part on the defendant's conduct under circumstances involving a foreseeable risk of harm." *Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, ¶ 55, 245 Wis. 2d 772, 629 N.W.2d 727. To prevail under strict liability, a plaintiff must prove that: (1) the product was in a defective condition when it left the possession or control of the seller; (2) it was unreasonably dangerous to the user or consumer; (3) the defect was a cause of the plaintiff's injuries or damages; (4) the seller engaged in the business of selling such a product; and (5) the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was in when the seller sold it. *Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967).

Here, what is lacking in the strict liability for defective design claim is lacking in the negligent design claim as well. Neither claim alleges a design defect that is not characteristic of the product itself. As such, neither alleges a design feature that makes the design of white lead carbonate pigment defective.

106

reflect developments in the law. *See* Owen, *supra,* at 980. In response, the American Law Institute introduced the Restatement (Third) of Torts: Products Liability in 1998. One major innovation was that the Restatement (Third) split products liability into three distinct categories: manufacturing defects, design defects, and defects based on failure to warn. *See* Restatement (Third) of Torts: Products Liability § 2 (1998). In defining these categories, the restatement eschewed the doctrinal labels "strict liability" and "negligence." Rather, the restatement defined the categories functionally, according to their required elements of proof. Owen, *supra,* at 982.

¶ 18. Although we have recognized that the Restatement (Third) may offer new insights into product liability, we have neither adopted nor rejected it in its entirety.[8] *Haase v. Badger Mining Corp.,* 2004 WI 97, ¶ 23, 274 Wis. 2d 143, 682 N.W.2d 389. Section 402A of the Restatement (Second) of Torts has remained the touchstone of our analysis for strict products liability.

B

¶ 19. The next threshold area of discussion requires that we pinpoint the product that is the subject of the design defect claims in this case. The identity of the product is essential to an analysis of its design. The circuit court and the court of appeals based their analyses on the design of white lead carbonate pigment, but Godoy argues that the product in question is actually residential paint pigment.

¶ 20. An examination of the complaint, however, undermines Godoy's argument. The complaint alleges that "[t]he white lead carbonate pigment designed . . . by

---

[8] Recently, we stated that the Restatement (Third)'s definition of "defective design" is "fundamentally at odds with current Wisconsin products liability law." *Green,* 245 Wis. 2d 772, ¶ 72.

107

the Industry Defendants was and is an inherently defective and unreasonably dangerous product." The complaint states that defendant manufacturers are strictly liable because the defect existed "[a]t the time the white lead carbonate left possession and control of the Industry Defendants[.]" The complaint refers to "white lead carbonate," "white lead pigment," or "white lead carbonate pigment" dozens of times.[9] The words "residential paint pigment" do not appear in the complaint.

■■

¶ 21. During the review of a motion to dismiss, the allegations in a complaint must be construed liberally in favor of stating a cause of action. *John Doe 1*, 303 Wis. 2d 34, ¶ 12. Nonetheless, in a products liability case, the plaintiff must—at minimum—identify the product alleged to be defective. Doing so puts the defendant on notice and allows the defendant to begin building a defense. *See Midway Motor Lodge of Brookfield v. Hartford Ins. Group*, 226 Wis. 2d 23, 35, 593 N.W.2d 852 (Ct. App. 1999) ("[T]he complaint must give the defendant fair notice of not only the plaintiff's claim but the grounds upon which it rests as well." (internal quotations omitted)). A liberal pleading standard cannot transform a complaint regarding "white lead carbonate pigment" into one regarding "residential paint pigment."

■

¶ 22. Further, in order to advance his claim, the product cannot be residential paint pigment because Godoy is proceeding under the *Collins* risk-contribution theory. Normally, an injured plaintiff is required to

[9] The terms "white lead carbonate" or "white lead pigment" are found at least once and sometimes repeatedly in the following paragraphs of the first amended complaint: 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 25, 26, 27, 28, 30, 36, 37, 38, 39, 41, 42, 44, 46(a), 46(b), 46(c), and 46(d).

identify the particular manufacturer of the product that caused the injury. *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 181–82, 342 N.W.2d 37 (1984). Under risk-contribution, however, the plaintiff is not required to identify the specific manufacturer when all similar products are fungible and identically defective. *Id.* at 180, 194.

¶ 23. We recently applied the risk-contribution theory to white lead carbonate pigment.[10] *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523. In *Thomas*, we concluded that for the purposes of risk-contribution, white lead carbonate pigment is fungible, and all manufacturers of white lead carbonate pigment could be held jointly and severally liable for injuries caused by the product. *Id.*, ¶ 27. We have not, however, applied the risk-contribution theory to residential paint pigment.

¶ 24. Nonetheless, *Thomas* provides little guidance for the issue we address in this case. This case is about defective design claims and *Thomas* was based on failure to warn claims. The question of whether white lead carbonate pigment was defectively designed was not before the *Thomas* court. All defective design claims had been dismissed at the circuit court, and that ruling was not appealed. *Thomas*, 285 Wis. 2d 236, ¶ 181 n.2 (Wilcox, J., dissenting).

¶ 25. Because Godoy cannot identify which defendant produced the defective product that caused his injury, he must proceed under the risk-contribution

---

[10] In the present case, the court of appeals mistakenly stated that the product in *Thomas ex rel. Gramling v. Mallett*, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523, was paint containing white lead carbonate. *See Godoy*, 306 Wis. 2d 226, ¶¶ 3, 5. This statement misconstrues our holding in *Thomas*.

theory. Godoy does not ask us to extend the risk-contribution theory to residential paint pigment. He does not assert that all residential paint pigments are identically defective, which is a prerequisite of risk-contribution. Perhaps he does not assert that all residential paint pigments are identical because he cannot make such an assertion given that not all residential paint pigments contain lead, the alleged defect. Accordingly, based on a review of the complaint, we determine that the product at issue is white lead carbonate pigment.

## IV

¶ 26. Having examined these threshold matters, we now address the substantive issue before the court. At issue is the narrow question of whether a complaint alleging strict liability and negligence for a defective design states a claim where (1) the product is white lead carbonate pigment; (2) the alleged design defect is the presence of lead; and (3) the defendant manufacturers were manufacturers of white lead carbonate pigment.

¶ 27. Under *Dippel* and the Restatement (Second) of Torts, manufacturers of defective products can be liable for the injuries their products cause, regardless of the care taken by the manufacturer or the foreseeability of the harm:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is liable for physical harm . . . if:
>
> (a) The seller is engaged in the business of selling such a product, and
>
> (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A(1). Section 402A, along with its comments, defines what it means to be defective.

¶ 28. Nonetheless, a determination that a product is *defective* is not identical to a determination that the product was *defectively designed*. Put another way, the fact that a defect exists does not compel the conclusion that the source of the defect is the product's design. This distinction makes a difference.

¶ 29. The issue in this case is not whether white lead carbonate pigment is defective, but whether the source of the alleged defect is the product's design. Wisconsin cases have discussed three categories of product defects—manufacturing defects, design defects, and defects based on a failure to adequately warn. A product has a manufacturing defect when it deviates from the manufacturer's specifications, and that deviation causes it to be unreasonably dangerous.[11] A product has a design defect when the design itself is the cause of the unreasonable danger.[12] Finally, a product is defective based on a failure to adequately warn when an

---

[11] *See, e.g., City of Franklin v. Badger Ford Truck Sales, Inc.,* 58 Wis. 2d 641, 648–49, 207 N.W.2d 866 (1973) (affirming a jury verdict that a wheel was defectively constructed because the wheel did not meet manufacturer specifications).

[12] *See, e.g., Green,* 245 Wis. 2d 772 (concluding that latex gloves were defectively designed because they contained excessive levels of allergy-causing latex proteins, and because they were powdered, which increased the likelihood that the allergenic proteins would be inhaled); *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.,* 121 Wis. 2d 338, 346, 375, 360 N.W.2d 2 (1984) (concluding that a car seat was defectively designed because it was not padded with energy-absorbing material).

intended use of the product is dangerous, but the manufacturer did not provide sufficient warning or instruction.[13] Although Section 402A of the Restatement (Second) does not draw clear lines between these types of defects, the comments provide guidance, discussed below.

¶ 30. Godoy's complaint does not identify a particular design feature that is alleged to be defective. However, a fair reading of the complaint suggests that the alleged defect is the presence of lead.[14]

¶ 31. Lead is a characteristic ingredient of white lead carbonate pigment. By definition, white lead carbonate pigment contains lead. Removing lead from

---

[13] *See, e.g., Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 737, 218 N.W.2d 279 (1974) (concluding that a tractor could be unreasonably dangerous and defective when the manufacturer failed to adequately inform the consumer that engaging the clutch would not turn off the fan).

[14] At the hearing on the motion to dismiss, the circuit court asked Godoy's counsel to identify the specific defect in the design of white lead carbonate pigment. Godoy's counsel identified lead. The exchange between Godoy's counsel, Mr. Earle, and the court was set forth in the transcript as follows:

MR. EARLE: ... This is a motion to dismiss. There are fact questions about whether or not white lead carbonate is designed in a defective manner.

THE COURT: There is no question that you can't design white lead carbonate without lead, is there?

MR. EARLE: Right.

THE COURT: That is the defect that you are claiming, the harmful defect, that is what makes white lead carbonate dangerous. That is the defect in it, do you agree?

MR. EARLE: I agree.

THE COURT: There is no dispute about any of those facts. ...

white lead carbonate pigment would transform it into a different product. Under these circumstances, we conclude that the design of white lead carbonate pigment is not defective.

¶ 32. An analogy illustrates the distinction. Foil can be made using ingredients other than aluminum—gold, for example—but aluminum foil cannot be made without aluminum. The presence of aluminum is characteristic of aluminum foil. If aluminum posed a hidden danger that the ultimate consumer would not contemplate, a manufacturer might be liable based on the failure to adequately warn or other claims. However, the manufacturer would not be liable based on the design of aluminum foil.

¶ 33. The comments to Section 402A support our conclusion. Comment h lists four potential deficiencies that can result in a defective condition: foreign objects, deterioration before sale, the way in which the product was packaged or prepared, and "harmful ingredients, not characteristic of the product itself." Restatement (Second) of Torts § 402A, cmt. h. It does not state that a defective condition can arise from harmful ingredients that *are* characteristic of the product. *See id.* However, if a manufacturer "has reason to anticipate that danger may result from a particular use . . . [the manufacturer] may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition." *Id.*; *see also id.* cmt. j ("In order to prevent the product from being unreasonably dangerous, the [manufacturer] may be required to give directions or warning, on the container, as to its use.").

¶ 34. This distinction is consistent with Wisconsin law. *See Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727. In *Green,* the

plaintiff was a hospital worker who developed a severe allergy to latex. *Id.*, ¶ 1. She brought suit against the manufacturer of latex gloves, alleging a defective design. *Id.* Notably, the plaintiff did not claim that latex gloves were defective because they contained latex. The presence of latex is "characteristic" of latex gloves. Rather, the plaintiff alleged that they were defective because (1) they contained excessive levels of latex; and (2) they were powdered, which allowed the latex to be airborne. *Id.*, ¶ 11. In effect, she argued that the quantity of latex in the gloves was not characteristic of the product, and that a particular design feature, powder, made the gloves more dangerous.

¶ 35. Godoy argues that the defendants confuse barring a design defect claim based on characteristic ingredients with barring a claim based on the open and obvious danger doctrine. Under the open and obvious danger doctrine, a manufacturer is not liable for injuries when the danger posed by the product should have been apparent to the consumer. *See Tanner v. Shoupe,* 228 Wis. 2d 357, 367, 596 N.W.2d 805 (Ct. App. 1999) ("In order for a defective design to render a product unreasonably dangerous the defect must be hidden from the ordinary consumer, that is, not an open and obvious defect.").

¶ 36. The doctrine is not applicable in this case. Under the open and obvious danger doctrine, a manufacturer is not strictly liable when a knife cuts flesh, when an alcoholic beverage leads to intoxication, or when the flame on a gas stove burns the chef. *See Dippel,* 37 Wis. 2d at 459; *Greif v. Anheuser-Busch Cos. Inc.,* 114 F. Supp. 2d 100, 103 (D. Conn. 2000). Further, a Volkswagen driver who has been injured in a car

114

accident cannot allege that the car was defectively designed because it was too small—any danger posed by its size should have been readily apparent. *Arbet v. Gussarson,* 66 Wis. 2d 551, 225 N.W.2d 431 (1975), *overruled in part on other grounds by Greiten v. LaDow,* 70 Wis. 2d 589, 601 n.1, 235 N.W.2d 677 (1975) (Heffernan, J., concurring). Here, the danger is not readily apparent. Godoy's complaint alleges that the dangerous quality of white lead carbonate pigment is hidden and that the average consumer would not contemplate the risk.[15]

¶ 37. The circuit court correctly concluded that the complaint failed to state claims of defective design. A claim for defective design cannot be maintained where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself. Without lead, there can be no white lead carbonate pigment. We therefore conclude that the complaint fails to allege a design feature that makes the design of white lead carbonate pigment defective.

V

¶ 38. We have thus determined that Godoy's defective design claims were properly dismissed. However, we recognize that two areas of products liability law

[15] Under Section 402A, manufacturers have an obligation to warn consumers about the hidden dangers of their products. *See* Restatement (Second) of Torts § 402A cmts. h., i. If the defendant manufacturers had reason to anticipate that white lead carbonate pigment would be dangerous for its intended use, that fact could give rise to a requirement to give adequate warning. Without such warning, white lead carbonate pigment could be considered "defective" under § 402A. These legal and factual questions properly remain pending at the circuit court.

require further clarification given the arguments advanced by the parties interpreting the analysis of the court of appeals. We take this opportunity to reaffirm that: (a) Wisconsin strict products liability law does not require a plaintiff to prove the feasibility of an alternative design; and (b) the substantial change defense is not a basis of our decision here and was not an alternative basis of the decision of the court of appeals. Substantial change is a fact-intensive inquiry which is generally not appropriate to decide on a motion to dismiss for failure to state a claim. We address these two issues in turn.

## A

¶ 39. Godoy argues that the court of appeals' analysis was in error because it relied on the Restatement (Third) of Torts: Products Liability § 2(b), which Wisconsin declined to adopt in *Green*, 245 Wis. 2d 772, ¶ 74. He asserts that the court of appeals circumvented the consumer contemplation test, the established test for a product defect under Wisconsin law, and instead substituted the Restatement (Third)'s reasonable alternative design requirement.

¶ 40. This court recently reaffirmed that Wisconsin applies the consumer contemplation test to determine whether a product is defective under strict liability. *Id.*, ¶ 35. "Defective," for purposes of the consumer contemplation test, means that the product is "in a condition not contemplated by the ultimate consumer and unreasonably dangerous to that consumer." *Id.*, ¶ 29 (*quoting Beacon Bowl, Inc. v. Wis. Elec. Power Co.*, 176 Wis. 2d 740, 792, 501 N.W.2d 788 (1993)).

¶ 41. The term 'defect' is not susceptible to any general definition. Rather, the determination is made on a case-by-case basis relying on the ultimate consumers' expectations. *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.,* 121 Wis. 2d 338, 368, 360 N.W.2d 2 (1984). However, the fact that a defect exists does not compel the conclusion that the source of the defect is the product's design. The question in this case is not whether white lead carbonate pigment is defective, but whether the source of the alleged defect is the product's design.

¶ 42. The court of appeals concluded that the design could not be defective because there is no alternative design to make white lead carbonate pigment without using lead. *See Godoy,* 306 Wis. 2d 226, ¶ 8 ("[A]s we have seen there is no 'alternative design' to make white-lead carbonate without using lead."). To the extent that the court of appeals relied on a reasonable alternative design requirement, the court's analysis was misguided.

¶ 43. We have explained that although the feasibility of an alternative design can be considered when evaluating a design defect claim, it is not a requirement. *Sumnicht,* 121 Wis. 2d at 370–71. In *Sumnicht,* we refused to require a plaintiff to prove that a safer alternative design was commercially available:

> A product may be defective and unreasonably dangerous even though there are no alternative, safer designs available. . . . The question is not whether any other manufacturer has produced a safer design . . . .

*Id.* at 371; *see also Green,* 245 Wis. 2d 772, ¶ 73 (concluding that proof of a reasonable alternative de-

sign would "add[] an additional—and considerable—element of proof" to the analysis.)

¶ 44. Godoy argues that it is inconsistent to reject a reasonable alternative design requirement and still maintain that characteristic ingredients of the product cannot support a claim for defective design. Godoy asserts that our conclusion is analogous to imposing a reasonable alternative design requirement.

¶ 45. Holding that the presence of an ingredient which is "characteristic of the product itself" is an improper basis for a defective design claim is not equivalent to imposing a reasonable alternative design requirement. We do not require that a plaintiff affirmatively prove, through expert testimony, that an alternative design is commercially viable. We do not impose an expensive burden and require a battle of the experts over competing product designs. We simply acknowledge that some ingredients cannot be eliminated from a design without eliminating the product itself. When the ingredient cannot be designed out of the product, the Restatement (Second) instructs that although other claims may be asserted, the proper claim is not design defect.

B

¶ 46. The manufacturer defendants also argue that Godoy cannot recover for a design defect because white lead carbonate pigment is substantially changed when it is integrated into paint. Section 402A states that a product must reach the consumer "without substantial change" in order for the manufacturer to be strictly liable for an injury it causes. Restatement (Second) of Torts § 402A(1)(b). Our cases state that to

118

succeed under the substantial change defense, the change must be both substantial and material. *Glassey v. Cont'l Ins. Co.,* 176 Wis. 2d 587, 601, 500 N.W.2d 295 (1993). The purpose of this requirement is to protect a manufacturer from liability when the dangerously defective aspect of the product was altered or introduced after the product left the manufacturer's control.

¶ 47. Defendant manufacturer American Cyanamid asserts that the "substantial change" defense was actually an alternative basis for the court of appeals' decision. We do not find support for this assertion. *See Godoy,* 306 Wis. 2d 226, ¶ 7.

¶ 48. American Cyanamid cites to the court of appeals' opinion, which provides: "Here, consistent with *Shawver,* the white-lead carbonate had to be further processed by its integration into paint." *Id.,* ¶ 7. It is a stretch to conclude from this citation that the court of appeals set forth an alternative basis for its dismissal of the plaintiff's complaint based on a substantial change defense.

¶ 49. Likewise, the substantial change defense was not a basis for the circuit court's decision to dismiss Godoy's defective design claims. The defendants' motion to dismiss did not argue that the claims should be dismissed because the white lead carbonate pigment experienced a substantial and material change after leaving the possession and control of the defendant manufacturers. In fact, the circuit court record is devoid of any reference to substantial change.

¶ 50. It is not surprising that substantial change was not discussed at the circuit court. Often, the issue of whether there was a substantial and material change is a fact-intensive inquiry. This type of inquiry may not

be amenable to resolution on a motion to dismiss where the facts in the complaint are accepted as true.[16]

¶ 51. In this case, Godoy's first amended complaint alleges that "[t]he white lead carbonate that the Plaintiff was exposed to was in substantially the same condition as it was before leaving the control of the Industry Defendants." The complaint further alleges that "[a]t the time that the white lead carbonate left the possession and control of the Industry Defendants, it was a defective and unreasonably dangerous product[.]"

¶ 52. For purposes of a motion to dismiss, the allegations of the complaint are taken as true and are to be liberally construed in favor of allowing a cause of action to be maintained. *John Doe 1,* 303 Wis. 2d 34, ¶ 12. Given the procedural posture of this case, we do not address the issue of whether as a matter of law the white lead carbonate pigment underwent a substantial and material change.

¶ 53. Further, we emphasize that our decision here should in no way be interpreted to provide component manufacturers blanket immunity from liability. Integration into another product does not shift responsibility from the manufacturer of a defective component

---

[16] The very cases that American Cyanamid relies upon to advance its argument illustrate this point. It cites to the following cases: *Glassey v. Cont'l Ins. Co.,* 176 Wis. 2d 587, 500 N.W.2d 295 (1993); *Haase v. Badger Mining Corp.,* 2004 WI 97, 274 Wis. 2d 143, 682 N.W.2d 389; *Shawver v. Roberts Corporation,* 90 Wis. 2d 672, 280 N.W.2d 226 (1979); *City of Franklin,* 58 Wis. 2d 641; *Westphal v. E.I. du Pont De Nemours & Co.,* 192 Wis. 2d 347, 531 N.W.2d 386 (Ct. App. 1995). None of these cases was decided at a motion to dismiss. With the exception of *Westphal,* each case had been submitted to a jury. *Westphal* was decided on summary judgment, after a record had been fully developed through discovery.

to another party "who [is] in no position to detect the hidden defect." *City of Franklin v. Badger Ford Truck Sales, Inc.*, 58 Wis. 2d 641, 649–50, 207 N.W.2d 866 (1973). We have stated:

> Where there is no change in the component part itself, but it is merely incorporated into something larger, and where the cause of harm or injury is found, as here, to be a defect in the component part, we hold that, as to the ultimate user or consumer, the strict liability standard applies to the maker and supplier of the defective component part. Where the component part is subject to further processing or substantial change, or where the causing of injury is not directly attributable to defective construction of the component part, the result might be different.

*Id.* at 649. When component manufacturers introduce defective components into the stream of commerce, they may be held liable for resulting injuries under the particular circumstances of the case.

## VI

¶ 54. We determine that the circuit court correctly concluded that the complaint failed to state claims of defective design. A claim for defective design cannot be maintained where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself. Without lead, there can be no white lead carbonate pigment. The complaint fails to allege a design feature that makes the design of white lead carbonate pigment defective. Accordingly, albeit with some modification in the rationale, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 55. PATIENCE DRAKE ROGGENSACK, J., did not participate.

¶ 56. ANN WALSH BRADLEY, J. (*concurring*). I write a concurrence separate from the lead opinion to address an issue neither raised nor advanced by the parties in this case. Instead, it is a policy determination advanced by Justice Prosser's concurrence below. *See* Justice Prosser's concurrence (joined by Justices Ziegler and Gableman).

¶ 57. The concurrence below mistakes judicial restraint for intransigence. Challenging the lead opinion to "muster[] the intellectual firepower to defend" our reliance on the consumer contemplation test, the concurrence wants to square off and impose an agenda it seeks to advance. *See id.,* ¶ 109.

¶ 58. Neither of the parties in this case has called upon the court to deviate from over 40 years of case law and adopt the Restatement (Third) of Torts: Products Liability § 2(b). In their brief, the defendant manufacturers disclaimed any reliance by the court of appeals on the Restatement (Third), arguing that "the Restatement (Third) of Torts was not briefed, discussed, or even mentioned by any party prior to the Court of Appeals' sua sponte discussion of it."[1] Both parties agree

---

[1] The court of appeals discussed the Restatement (Third) in a single paragraph of its opinion. See *Godoy v. E.I. du Pont de Nemours & Co.,* 2007 WI App 239, ¶ 8, 306 Wis. 2d 226, 743 N.W.2d 159. It prefaced its comments as follows: "Wisconsin has neither adopted nor rejected the Restatement (Third) of Torts: Products Liability (1998), . . . and we need not adopt it here[.]" *Id.* (citation omitted).

Further, contrary to the assertion in Justice Prosser's concurrence, the Restatement (Third) was not advanced as an alternative ground for recovery in *Horst v. Deere & Co.,* 2009 WI 75, ___ Wis. 2d ___, 769 N.W.2d 536. See Justice Prosser's concurrence, ¶ 81 n.2. For a description of the negligible discussion of the Restatement (Third) in *Horst, see* ___ Wis. 2d ___, ¶ 84 (J. Crooks, concurring).

that the consumer contemplation test is the applicable test, and that it controls the outcome in this case.

¶ 59. Judicial restraint is especially appropriate here because adopting the Restatement (Third)'s approach to product liability would be a sea change in Wisconsin law. Over the last 42 years since we adopted Restatement (Second) of Torts § 402A, manufacturers of defective products can be held strictly liable even if they were not negligent. *See Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967). "Defective," for purposes of the consumer contemplation test, means that the product is "in a condition not contemplated by the ultimate consumer and unreasonably dangerous to that consumer." *Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, ¶ 29, 245 Wis. 2d 772, 629 N.W.2d 727.

¶ 60. Strict products liability focuses on the dangerous condition of the *product* rather than on the manufacturer's *conduct.* Under the Restatement

---

Any doubt as to whether the plaintiffs in *Horst* advocated for the adoption of the Restatement (Third) is erased by a review of the oral arguments. No attorney uttered the words "Restatement (Third)" at oral argument. In fact, the plaintiffs' attorney specifically disclaimed any reliance on a risk-utility test, which is one of the principles underlying the Restatement (Third). He stated: "I didn't argue for the adoption of a risk-utility test[.]" *See* Wisconsin Court System, Supreme Court Oral Arguments, http://wicourts.gov/opinions/soralarguments.htm (search "Party name" for "Horst"; then follow "Playback" link), at 26:35.

Finally, Justice Prosser argues that the Restatement (Third) was briefed fully in a previous appeal to this court, *Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727. Justice Prosser is correct. The issue in *Green,* which was fully briefed and argued, was whether Wisconsin should adopt the Restatement (Third) § 2(b). The majority of the court said no. *See id.,* ¶¶ 71–74.

(Third)'s approach, however, strict liability for design defects is essentially eliminated. Instead, liability is predicated on the manufacturer's negligence. *See* Restatement (Third) § 2 cmt. a (Liability "*achieve[s] the same general objectives as does liability predicated on negligence.*") (emphasis added). The Restatement (Third) imposes liability "when the foreseeable risk of harm could have been reduced or avoided by the adoption of a reasonable alternative design[.]" *Id.* § 2(b).

¶ 61. The Restatement (Third)'s approach remains controversial. *See, e.g.,* George W. Conk, *Punctuated Equilibrium: Why Section 402A Flourished and the Third Restatement Languished,* 26 Rev. Litig. 799 (2007); Frank J. Vandall & Joshua F. Vandall, *A Call for an Accurate Restatement (Third) of Torts: Design Defect,* 33 U. Mem. L. Rev. 909, 922 (2003); Ellen Wertheimer, *The Biter Bit: Unknowable Dangers, the Third Restatement, and the Reinstatement of Liability Without Fault,* 70 Brook. L. Rev. 889 (2005); James A. Henderson, Jr. & Aaron D. Twerski, *A Fictional Tale of Unintended Consequences: A Response to Professor Wertheimer,* 70 Brook. L. Rev. 939 (2005); William E. Westerbeke, *The Sources of Controversy in the New Restatement of Products Liability: Strict Liability Versus Products Liability,* 8 Kan. J.L. & Pub. Pol'y 1 (1998–1999).

¶ 62. Unlike the orientation of § 402A, which arose out of a concern for the protection of consumers, the orientation of Restatement (Third) reportedly emphasizes the protection of manufacturers. One authority observes the elimination of the consumer contemplation test "from the products liability equation is highly significant, and symbolic of the orientation of the Third Restatement towards protecting manufacturers." Wertheimer, *supra,* at 927.

¶ 63. Some jurisdictions that have adopted the Restatement (Third) are now back-tracking. The current judicial trend appears to be a return to the pro-consumer policies of origin and reinstating strict products liability under § 402A. *See id.* at 893.

¶ 64. In advocating for this policy change, the concurrence in this case and the concurrence in *Horst v. Deere & Co.* (released today)[2] eschew the role of an appellate court. Instead, they appear to act like legislators, advancing a policy initiative which they favor. Typically, it is the role of the legislature to identify and enact policy initiatives. Appellate courts, on the other hand, play a more restrained role.

¶ 65. Courts decide cases and controversies. A court depends upon the parties to identify and raise issues and to advocate for a position. After considering the parties' briefs and arguments, the court renders a decision.

¶ 66. By contrast, the concurrence here would toss stare decisis to the wind. It would overrule or otherwise modify scores of cases which refer to or apply § 402A as the test for products liability. These cases would no longer be guides and precedent for litigants and the courts. Forty-two years of judicial analysis should not be thrown down the tubes without the benefit of briefing or argument by the parties.[3]

---

[2] 2009 WI 75, ___ Wis. 2d ___, 769 N.W.2d 536.

[3] *See, for example:*

- *Tatera v. FMC Corp.*, 2009 WI App 80, __ Wis. 2d __, 768 N.W.2d 198 (publication decision pending);

- *Haase v. Badger Mining Corp.*, 2004 WI 97, 274 Wis. 2d 143, 682 N.W.2d 389;

- *Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727;

¶ 67. As is, Justice Prosser's concurrence in this case and Justice Gableman's concurrence in *Horst* leave Wisconsin law unsettled. Does *Green* remain Wisconsin

- *Insolia v. Philip Morris, Inc.,* 216 F.3d 596 (7th Cir. 2000) (applying Wisconsin law);
- *Morden v. Continental AG,* 2000 WI 51, 235 Wis. 2d 325, 611 N.W.2d 659;
- *Sharp ex rel. Gordon v. Case Corp.,* 227 Wis. 2d 1, 595 N.W.2d 380 (1999);
- *Bittner v. American Honda Motor Co., Inc.,* 194 Wis. 2d 122, 533 N.W.2d 476 (1995);
- *Westphal v. E.I. du Pont de Nemours & Co., Inc.,* 192 Wis. 2d 347, 531 N.W.2d 386 (Ct. App. 1995);
- *Sedbrook v. Zimmerman Design Group, Ltd.,* 190 Wis. 2d 14, 526 N.W.2d 758 (Ct. App. 1994);
- *Estate of Cook v. Gran-Aire, Inc.,* 182 Wis. 2d 330, 513 N.W.2d 652 (Ct. App. 1994);
- *Rogers v. AAA Wire Prods., Inc.,* 182 Wis. 2d 263, 513 N.W.2d 643 (Ct. App. 1994);
- *Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.,* 176 Wis. 2d 740, 501 N.W.2d 788 (1993);
- *Glassey v. Continental Ins. Co.,* 176 Wis. 2d 587, 500 N.W.2d 295 (1993);
- *Northridge Co. v. W.R. Grace and Co.,* 162 Wis. 2d 918, 471 N.W.2d 179 (1991);
- *Kolpin v. Pioneer Power & Light Co., Inc.,* 162 Wis. 2d 1, 469 N.W.2d 595 (1991);
- *Nelson v. Nelson Hardware, Inc.,* 160 Wis. 2d 689, 467 N.W.2d 518 (1991);
- *Rolph v. EBI Cos.,* 159 Wis. 2d 518, 464 N.W.2d 667 (1991);
- *Kemp v. Miller,* 154 Wis. 2d 538, 453 N.W.2d 872 (1990);
- *Estate of Schilling v. Blount, Inc.,* 152 Wis. 2d 608, 449 N.W.2d 56 (Ct. App. 1989);
- *Tony Spychalla Farms, Inc. v.* Hopkins Agr. Chemical Co., 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989);

126

law? How are circuit courts and practitioners to grapple
with the significance of the fact that in both this case

- *St. Clare Hosp. of Monroe v. Schmidt, Garden, Erickson, Inc.,* 148 Wis. 2d 750, 437 N.W.2d 228 (Ct. App. 1989);

- *O'Brien v. Medtronic, Inc.,* 149 Wis. 2d 615, 439 N.W.2d 151 (Ct. App. 1989);

- *Mulhern v. Outboard Marine Corp.,* 146 Wis. 2d 604, 432 N.W.2d 130 (Ct. App. 1988);

- *Griffin v. Miller,* No. 1986AP1562, unpublished slip op. (Wis. Ct. App. Oct. 1, 1987);

- *Van's Realty Const. of Appleton, Inc. v. Blount Heating and Air Conditioning, Inc.,* No. 1985AP1812, unpublished slip op. (Wis. Ct. App. Oct. 7, 1986);

- *Clarke v. Flad Assocs.,* No. 1984AP780, unpublished slip op. (Wis. Ct. App. Jan. 27, 1988);

- *Gonzalez v. City of Franklin,* 128 Wis. 2d 485, 383 N.W.2d 907 (Ct. App. 1986);

- *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.,* 121 Wis. 2d 338, 360 N.W.2d 2 (1984);

- *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 342 N.W.2d 37 (1984);

- *Burrows v. Follett and Leach, Inc.,* 115 Wis. 2d 272, 340 N.W.2d 485 (1983);

- *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 331 N.W.2d 585 (1983);

- *Krueger v. Tappan Co.,* 104 Wis. 2d 199, 311 N.W.2d 219 (Ct. App. 1981);

- *Wangen v. Ford Motor Corp.,* 97 Wis. 2d 260, 294 N.W.2d 437 (1980);

- *Shawver v. Roberts Corp.,* 90 Wis. 2d 672, 280 N.W.2d 226 (1979);

- *Priske v. General Motors Corp.,* 89 Wis. 2d 642, 279 N.W.2d 227 (1979);

- *Black v. General Elec. Co.,* 89 Wis. 2d 195, 278 N.W.2d 224 (Ct. App. 1979);

- *Ransome v. Wisconsin Elec. Power Co.,* 87 Wis. 2d 605, 275 N.W.2d 641 (1979);

and in *Horst,* an equal number of justices have voted to change Wisconsin law as have voted to uphold it?

¶ 68. I am uncertain whether the Restatement (Third) should be adopted. What I am certain of, however, is that rather than pushing a predetermined agenda, I would wait until the issue is raised by a party, and briefed and argued before this court.

¶ 69. For the reasons discussed above, I respectfully concur.

- *Kozlowski v. John E. Smith's Sons Co.,* 87 Wis. 2d 882, 275 N.W.2d 915 (1979);

- *Keller v. Welles Dep't. Store of Racine,* 88 Wis. 2d 24, 276 N.W.2d 319 (Ct. App. 1979);

- *Austin v. Ford Motor Co.,* 86 Wis. 2d 628, 273 N.W.2d 233 (1979);

- *Fonder v. AAA Mobile Homes, Inc.,* 80 Wis. 2d 3, 257 N.W.2d 841 (1977);

- *Heldt v. Nicholson Mfg. Co.,* 72 Wis. 2d 110, 240 N.W.2d 154 (1976);

- *Howes v. Deere Co.,* 71 Wis. 2d 268, 238 N.W.2d 76 1976);

- *Barter v. General Motors Corp.,* 70 Wis. 2d 796, 235 N.W.2d 523 (1975);

- *Greiten v. LaDow,* 70 Wis. 2d 589, 235 N.W.2d 677 (1975);

- *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.,* 69 Wis. 2d 326, 230 N.W.2d 794 (1975);

- *Schuh v. Fox River Tractor Co.,* 63 Wis. 2d 728, 218 N.W.2d 279 (1974);

- *City of Franklin v. Badger Ford Truck Sales Inc.,* 58 Wis. 2d 641, 207 N.W.2d 866 (1973);

- *Schnabl v. Ford Motor Co.,* 54 Wis. 2d 345, 195 N.W.2d 602 (1972);

- *Netzel v. State Sand & Gravel Co.,* 51 Wis. 2d 1, 186 N.W.2d 258 (1971);

- *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967) (adopting the Restatement (Second) § 402A and strict products liability).

¶ 70. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

¶ 71. N. PATRICK CROOKS, J. (*concurring*). I join the lead opinion, but I write separately in response to Justice Prosser's concurrence. Justice Prosser would have this court "acknowledge that the law has evolved and adopt Restatement (Third) of Torts: Products Liability § 2(b) to analyze products liability claims alleging defective design." Justice Prosser's concurrence, ¶ 110.

¶ 72. I emphasize that the parties in this case did not invite the court to adopt § 2(b) of the Restatement (Third). The briefing and arguments to the court of appeals and this court in this case did not address the implications of adopting that approach. As the brief of defendants-respondents noted, "In short, the Restatement (Third) of Torts was not briefed, discussed, or even mentioned by any party prior to the Court of Appeals' sua sponte discussion of it." Before this court, the parties vigorously disputed whether the court of appeals, in referring to § 2(b) in its ruling, had "essentially adopted" the provision and based its ruling on it, but no party advocated for its adoption.

¶ 73. Because any consideration of such a fundamental change in Wisconsin law should not be done without a full and thorough briefing followed by oral arguments before this court, I believe we should decline to reach beyond the controversy the parties ask us to resolve to consider adopting an approach that no party has asked us to adopt. The parties in this case argued that this case could be resolved on the basis of existing Wisconsin law, and we have done so. We should address the question of adopting Restatement (Third) § 2(b) when a case arises in which one of the parties asks us to

do so and not before. We need briefing and oral arguments before deciding to make a sea change in Wisconsin law—one that could result in throwing out forty-two years of precedent beginning with *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967).

¶ 74. I therefore respectfully concur.

¶ 75. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this concurrence.

¶ 76. DAVID T. PROSSER, J. (*concurring*). This review involves defective design claims against manufacturer defendants. While I agree with the lead opinion's decision to affirm the dismissal of these claims, I write separately to defend the merits of Restatement (Third) of Torts: Products Liability § 2(b) (1998). The lead opinion chastises the court of appeals for citing Restatement (Third), *see* lead op., ¶¶ 39–42, and it tries to put as much distance between Restatement (Third) and Wisconsin products liability law as possible, *see, e.g.,* lead op., ¶¶ 17–18, 39–45. The purpose behind this criticism of Restatement (Third) is evident in Justice Bradley's concurring opinion. Justice Bradley does not want to consider Restatement (Third); she wishes to bury it.

¶ 77. In 2001 former Justice Diane S. Sykes wrote that Wisconsin was "seriously out of step with product liability law as it has evolved since this court adopted Restatement (Second) of Torts § 402A [(1965)] in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967)." *Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, ¶ 122, 245 Wis. 2d 772, 629 N.W.2d 727 (Sykes, J., dissenting). Some members of this court would like to address this disparity. Nonetheless, the issue might not

130

have come up in this case had Justice Bradley not been so determined to discredit Restatement (Third) in her writings.

¶ 78. The truth is, however, that the justification provided by the lead opinion for dismissing the plaintiff's defective design claim is strikingly similar to the analysis that would be employed under Restatement (Third).

¶ 79. To illustrate, the lead opinion reasons that a claim for defective design cannot be maintained against the manufacturers of white lead carbonate pigment "where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself." Lead op., ¶ 2. Specifically, the opinion states, "Without lead, there can be no white lead carbonate pigment." *Id.* Similarly, Restatement (Third) § 2(b) would not impose liability against the pigment manufacturers for defective design because it would be impossible for them to design white lead carbonate pigment without using lead, *see id.,* and therefore, the plaintiff would be unable to submit evidence of a reasonable alternative design that, if adopted, would reduce or eliminate white lead carbonate pigment's potential dangers, *see* Restatement (Third) of Torts: Products Liability § 2. Although claiming not to "require that a plaintiff affirmatively prove . . . that an alternative design is commercially viable," *see* lead op., ¶ 45, the rationale employed by the lead opinion is ultimately tantamount to a conclusion that the plaintiff's claim must fail because he cannot establish a reasonable alternative design for white lead carbonate pigment.

¶ 80. Despite the similarity of analysis, the lead opinion declares that "[t]o the extent that the court of appeals relied on a reasonable alternative design re-

131

quirement [under Restatement (Third)], the court's analysis was misguided." *Id.*, ¶ 42.

¶ 81. The distinction between the analysis the lead opinion disparages and the analysis the lead opinion employs is too metaphysical to justify continuing disavowal of Restatement (Third) of Torts: Products Liability § 2(b). Instead of denigrating Restatement (Third), I would adopt § 2(b) of Restatement (Third) for analyzing defective design claims[1] and put Wisconsin back in step with the evolution of products liability law.[2]

---

[1] Justice Bradley asserts that adopting Restatement (Third) of Torts: Products Liability § 2(b) for analyzing defective design claims would require that this court "overrule or otherwise modify scores of cases." Justice Bradley's concurrence, ¶ 66; *Horst v. Deere & Co.*, 2009 WI 75, ¶ 133, ___ Wis. 2d ___, 769 N.W.2d 536 (Bradley, J., dissenting). The cases cited by Justice Bradley do not support her assertion. *See* Justice Bradley's concurrence, ¶ 66 n.3; *see also Horst*, ___ Wis. 2d ___, ¶ 133 n.2 (Bradley, J., dissenting).

Most notably, all but six of the cases cited by Justice Bradley were decided before Restatement (Third) was published in 1998. *See* Justice Bradley's concurrence, ¶ 66 n.3; *see also Horst*, ___ Wis. 2d ___, ¶ 133 n.2 (Bradley, J., dissenting). Therefore, there is no reason why this court would need to reach back to the cases decided before Restatement (Third) and overrule or otherwise modify their holdings. Moreover, a large portion of the pre-Restatement (Third) cases cited by Justice Bradley do not mention Restatement (Second) or involve claims for defective design and would not be disturbed by the adoption of § 2(b) of Restatement (Third) for defective design claims. *See Horst*, ___ Wis. 2d ___, ¶ 104 n.9 (Gableman, J., concurring).

[2] Although the parties in this case did not rely upon Restatement (Third) to support their arguments, that did not prevent the lead opinion from seizing the opportunity to discredit Restatement (Third) and create roadblocks to its eventual adoption in Wisconsin. If Restatement (Third) is not relevant to this dispute, then the lead opinion should not use six paragraphs addressing its substance. *See* lead op., ¶¶ 39–45.

## I

¶ 82. Restatement (Second) of Torts was promulgated by the American Law Institute (ALI) in 1965. Section 402A, entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer," was actually approved in 1964.

¶ 83. Section 402A was one of the most important and visionary sections of Restatement (Second). William L. Prosser (1898–1972), the preeminent scholar in American tort law who served as sole Reporter for most of the work on Restatement (Second), inspired and helped codify this strict liability section.

¶ 84. Section 402A reads as follows:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the

---

It should be noted that Restatement (Third) § 2(b) was discussed in some detail by the court of appeals when it decided this case. *See Godoy v. E.I. du Pont de Nemours & Co.,* 2007 WI App 239, ¶ 8, 306 Wis. 2d 226, 743 N.W.2d 159. Also, in their reply brief, the plaintiffs advanced Restatement (Third) as an alternative grounds for recovery in *Horst,* a case argued only a few months after the present case, and Restatement (Third) was discussed by an amicus brief in that case as well. *See Horst,* ___ Wis. 2d ___, ¶ 102 n.8 (Gableman, J., concurring) (quoting the plaintiffs' reply brief). Finally, Restatement (Third) § 2(b) was briefed fully in a previous appeal to this court. *See Green v. Smith & Nephew AHP, Inc.,* 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727.

user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

¶ 85. At the time that Section 402A was written and adopted, the law on products liability was largely undeveloped. For instance, the third edition of Prosser's *Handbook of the Law of Torts,* published in 1964, contained no chapter on products liability, and only a brief section on "Sellers of Chattels: Strict Liability." *See id.* at 672–85.

¶ 86. The principal concern with Section 402A today is that it is outdated and no longer reflects the complexities that have developed in products liability law over the past 45 years.

## II

¶ 87. In 1997, the ALI adopted Restatement (Third) of Torts: Products Liability. This limited, long-awaited undertaking represented "an almost total overhaul of Restatement (Second)['s]" products liability law. Restatement (Third) of Torts: Products Liability at 3. The new Restatement split products liability into three distinct categories: manufacturing defects, design defects, and defects based on failure to warn. *See id,* § 2. Each functional category now carries its own separate standard of liability. *See id.*

¶ 88. Sections 1 and 2 of Restatement (Third) of Torts: Products Liability read as follows:

§ 1. Liability of Commercial Seller or Distributor for Harm Caused by Defective Products

One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.

§ 2. Categories of Product Defect

A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:

(a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

¶ 89. The introduction to Restatement (Third) describes what necessitated such wholesale revision:

In 1964 The American Law Institute adopted § 402A as part of the Restatement Second of Torts . . . . The *major thrust of § 402A was to eliminate privity* so that a user or consumer, without having to establish negligence, could bring an action against a manufacturer, as well as against any other member of a distributive chain that had sold a product containing a *manufacturing defect. Section 402A had little to say about liability for design defects* or for products sold with inadequate warnings. In the early 1960s these areas of litigation were in their infancy.

In restating the law of products liability more than a quarter of a century later, the [ALI] had before it thousands of judicial decisions that had fine-tuned the law of products liability in a manner hardly imaginable when Restatement Second was written. *Issues that had not occurred to those members involved in drafting Restatement Second had become points of serious contention and debate in the courts. What should be the governing standard for design and warning liability?*

*Id.* at 3 (emphasis added); *see also* Victor E. Schwartz, *The Role of the Restatement in the Tort Reform Movement: The Restatement, Third, Torts: Products Liability: A Model of Fairness and Balance,* 10 Kan. J.L. & Pub. Pol'y 41, 42 (2000) ("Restatement (Second)'s *Section 402[A] shed no light on what should be the legal standard for defect of design.* None of the cases cited in support of § 402[A] discussed design liability. All of the cases concerned products that were mismanufactured.") (emphasis added).

¶ 90. As defective design claims became more prevalent in the late 1960s and the early 1970s, the ALI came to realize "that *§ 402A, created to deal with*

*liability for manufacturing defects, could not appropriately be applied to cases of design defects.*" Restatement (Third) of Torts: Products Liability § 1 cmt. a. (emphasis added). This is because the consumer contemplation test,[3] the test utilized by Restatement (Second) § 402A, makes little or no sense in the context of defective design claims.[4]

¶ 91. First, the test is amorphous and defies precise definition when used in a products liability case. *See* W. Page Keeton, *Prosser & Keeton on Torts* § 99, at 699 (5th ed. 1984) ("The test can be utilized to explain most any result that a court or jury chooses to reach. The application of such a vague concept does not provide much guidance for a jury.").

¶ 92. Second, consumer expectations regarding how a product should be designed are "more difficult to discern than in the case of a manufacturing defect." Restatement (Third) of Torts: Products Liability § 2 cmt. a. In fact, it is hard to imagine that ordinary consumers have any expectations regarding "the technical design characteristics of a product" other than the most basic expectation that the product be designed to work and to work safely. *See* Mary J. Davis, *Design Defect Liability: In Search of a Standard of Responsibility,* 39 Wayne L. Rev. 1217, 1236–37 (1993).

---

[3] Specifically, the consumer contemplation test asks whether the product in question, when it left the manufacturer, was in a condition not contemplated by the ordinary consumer, Restatement (Second) of Torts § 402A cmt. g. (1965), and whether the product was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer," *id.* at cmt. i.

[4] A similar argument can be made for failure to warn claims.

¶ 93. Third, applying the consumer contemplation test to defective design claims runs the risk of labeling entire product lines defective without ever considering the utility the products create for society. *See* Keeton, *supra,* § 99, at 698–99 ("This test can result in the identification of products as being defectively dangerous that are clearly not, as when a new drug is a great boon to humanity but a few are victimized by a side effect or adverse reaction that was an unknowable risk[.]") (footnote and citation omitted). Because a finding of liability for defective design has grave repercussions for the product at issue, courts should be required to consider not only the risks associated with the product but also the benefits. *See* Restatement (Third) of Torts: Products Liability § 2 cmt. a. ("Some sort of independent assessment of advantages and disadvantages, to which some attach the label 'risk-utility balancing,' is necessary [to determine whether a product is defectively designed].").

¶ 94. The lead opinion's willingness to close the door on Restatement (Third) of Torts: Products Liability § 2(b) evinces a belief that there is no meaningful difference among manufacturing defects, design defects, and failure to warn defects—that one standard of liability fits all three categories.

¶ 95. Most of the country has decided otherwise. Wisconsin is now one of only six states that clings to the consumer contemplation test as the exclusive test for analyzing defective design claims.[5]

---

[5] Alaska: *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 878 (1979).

Arkansas: *Boerner v. Brown & Williamson Tobacco Corp.,* 260 F.3d 837, 846 (8th Cir. 2001); *French v. Grove Mfg. Co.,* 656 F.2d 295, 298 (8th Cir. 1981).

## III

¶ 96. By separating the standards of liability for manufacturing defects, design defects, and failure to warn defects, Restatement (Third) § 2 offers significant improvements in products liability law.

¶ 97. Restatement (Third) § 2(b) removes the focus of the inquiry in defective design cases from the ordinary consumer's expectations and shifts it to asking whether the product's design was reasonable. *See id.,* § 2 cmt. d.

> Whereas a manufacturing defect consists of a product unit's failure to meet the manufacturer's design specifications, a product asserted to have a defective design meets the manufacturer's design specifications but raises the question whether the specifications themselves create unreasonable risks. Answering that question requires reference to a standard outside the specifications.

Hawaii: *Tabieros v. Clark Equip.* Co., 944 P.2d 1279, 1310–11 (1997); *Ontai v. Straub Clinic & Hosp. Inc.,* 659 P.2d 734, 739 (1983).

Nebraska: *Kudlacek v. Fiat,* 509 N.W.2d 603, 610 (1994).

Oklahoma: *Bishop v. Takata Corp.,* 12 P.3d 459, 461 (2000); *Lee v. Volkswagen of Am., Inc.,* 688 P.2d 1283, 1285 (1984).

Justice Bradley's concurrence cites Professor Ellen Wertheimer's commentary in *The Biter Bit: Unknowable Dangers, the Third Restatement, and the Reinstatement of Liability Without Fault,* 70 Brook L. Rev. 889, 893 (2005), for the claim that "[s]ome jurisdictions that have adopted the Restatement (Third) are now back-tracking." Justice Bradley's concurrence, ¶ 63. However, a close look at Professor Wertheimer's assertion shows virtually no empirical support for the statement. *See* Wertheimer, *supra,* at 934–37. Without citation to courts that have actually retreated from their previous adoption of Restatement (Third), Justice Bradley's reliance on Professor Wertheimer's assertion is unpersuasive.

Such a change in focus diminishes the likelihood that "strict liability will become absolute liability." *Green,* 245 Wis. 2d 772, ¶ 132 (Sykes, J., dissenting) ("[W]e must have some principled standards by which to evaluate product defectiveness in design . . . defect cases . . . . Evaluating design . . . defectiveness solely by reference to consumer expectations comes close to imposing absolute liability.").

¶ 98. Restatement (Third)'s risk-utility balancing approach flows from the premise that risks must be foreseeable in order for the manufacturer to protect against them. *See* Restatement (Third) of Torts: Products Liability § 2(b) (stating that a product "is defective in design when the *foreseeable risks of harm*" could have been reduced or eliminated by the adoption of a reasonable alternative design) (emphasis added). Holding manufacturers liable for defective design based on "the foreseeable risks of harm posed by the product" promotes efficient investment in product safety and avoids the risk of recklessly eliminating entire product lines as a result of a hidden or undiscoverable design risk. *Id.,* § 2 cmt. a. ("Most courts agree that, for the liability system to be fair and efficient, the balancing of risks and benefits in judging product design and marketing must be done in light of the knowledge of risks and risk-avoidance techniques reasonably attainable at the time of distribution.").

¶ 99. The fact that, under Restatement (Third) § 2(b), "a product is defective in design if the foreseeable risks of harm could have been reduced by a reasonable alternative design is based on the commonsense notion that liability for harm caused by product designs should attach only when harm is reasonably preventable." *Id.,* § 2 cmt. f.

140

## IV

¶ 100. Despite the lead opinion's suggestion to the contrary, Restatement (Third) is not unfriendly to and does not impose unreasonable burdens upon plaintiffs making products liability claims. *See* lead op., ¶¶ 42–43, 45. It is true that to recover for defective design under Restatement (Third), most plaintiffs are required to submit evidence establishing that the manufacturer could have adopted a reasonable alternative design and that adopting the alternative design would have reduced or eliminated the harm posed by the product. *See* Restatement (Third) of Torts: Products Liability § 2(b) & cmt. f. However, the reasonable alternative design requirement is not as significant a barrier to recovery as the lead opinion suggests. *See* lead op., ¶¶ 42–43, 45.

¶ 101. One of the lead opinion's primary gripes with the reasonable alternative design element under Restatement (Third) is that it will require an expensive "battle of the experts over competing product designs." *Id.*, ¶ 45. Although a complex products liability case may result in a "battle of the experts," this is not likely to be caused by the plaintiff having to submit sufficient evidence of a reasonable alternative design. Much of this evidence, where it exists, can be obtained through discovery. Even if Wisconsin did not adopt Restatement (Third) § 2(b) and incorporate its reasonable alternative design requirement into our defective design jurisprudence, a "battle of the experts" would likely remain the norm in complex products liability litigation.

¶ 102. In some defective design cases, however, expert testimony would not be necessary, even if the plaintiff were required to present evidence of a reasonable alternative design. In particular, "[c]ases arise in

which the feasibility of a reasonable alternative design is obvious and understandable to laypersons and therefore expert testimony is unnecessary to support a finding that the product should have been designed differently and more safely." Restatement (Third) of Torts: Products Liability § 2 cmt. f.[6]

¶ 103. Furthermore, the actual burden of presenting sufficient evidence of a reasonable alternative design would require only that the plaintiff establish "the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." *Id.* Thus, for plaintiffs who do need the assistance of expert testimony, there would be no requirement that an expert undertake the expensive and time-consuming burden of producing a model of the proposed reasonable alternative design. *Id.*

¶ 104. In addition, Restatement (Third) does not require proof of a reasonable alternative design in *all* defective design cases. Specifically, comment e. to Restatement (Third) § 2 leaves open the possibility that, absent a reasonable alternative design, courts may hold products to be defectively designed if the danger posed

---

[6] Comment f. to Restatement (Third) § 2 continues with the following:

> For example, when a manufacturer sells a soft stuffed toy with hard plastic buttons that are easily removable and likely to choke and suffocate a small child who foreseeably attempts to swallow them, the plaintiff should be able to reach the trier of fact with a claim that buttons on such a toy should be an integral part of the toy's fabric itself (or otherwise be [ir]removable by an infant) without hiring an expert to demonstrate the feasibility of an alternative safer design. Furthermore, other products already available on the market may serve the same or very similar function at lower risk and at comparable cost. Such products may serve as reasonable alternatives to the product in question.

by the product eclipses its social utility. *Id.*, § 2 cmt. e.[7] ("[T]he designs of some products are so manifestly unreasonable, in that they have low social utility and high degree of danger, that liability should attach even absent proof of a reasonable alternative design."); *see also id.*, § 2 cmt. b. Furthermore, under Restatement (Third) § 3, circumstantial evidence may be sufficient in some cases to support a conclusion that a product was defectively designed without requiring proof of a reasonable alternative design, if the product fails to perform its intended function. *Id.*, § 3;[8] *see also id.*, § 2 cmt. b. Finally, under Restatement (Third) § 4, absolute liability is imposed if the product's design is in violation of applicable product safety statutes or regulations.

¶ 105. In sum, the lead opinion's fear of Restatement (Third) § 2(b) and the reasonable alternative design requirement is exaggerated.

---

[7] Comment e. to Restatement (Third) § 2 is sometimes referred to as "the "Habush Amendment" in recognition of ALI Advisory Committee member Robert L. Habush from Milwaukee. *See* Victor E. Schwartz, *The Role of the Restatement in the Tort Reform Movement: The Restatement, Third, Torts: Products Liability: A Model of Fairness and Balance,* 10 Kan. J.L. & Pub. Pol'y 41, 45 (2000).

[8] Restatement (Third) of Torts: Products Liability § 3 states the following:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
>
> (a) was of a kind that ordinarily occurs as a result of product defect; and
>
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

¶ 106. Under some circumstances, plaintiffs may find Restatement (Third) more favorable to their chances of recovery than Restatement (Second). For example, manufacturer warnings can no longer inoculate the manufacturer from liability for the defect as was the case under Restatement (Second). *Id.*, § 2 cmt. 1. ("In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks."); James A. Henderson, Jr. & Aaron D. Twerski, *A Fictional Tale of Unintended Consequences[:] A Response to Professor Wertheimer,* 70 Brook. L. Rev. 939, 946 (2005) ("Several high-profile cases have taken this position much to the chagrin of manufacturers who sought to absolve themselves from liability because they had thoroughly warned against the dangers."). Similarly, Restatement (Third) does not recognize the "open and obvious danger" defense that manufacturers can use under Restatement (Second) to avoid liability for defectively designed products by making the product's dangerous conditions "open and obvious." Restatement (Third) of Torts: Products Liability § 2 cmt. d. ("The fact that a danger is open and obvious is relevant to the issue of defectiveness, but does not necessarily preclude a plaintiff from establishing that a reasonable alternative design should have been adopted that would have reduced or prevented injury to the plaintiff."); *see also* Davis, *supra,* at 1236–37. Consequently, it is not hard to imagine that some plaintiffs' products liability claims would be treated more favorably under Restatement (Third) than under Restatement (Second).

## VI

¶ 107. The two Reporters for Restatement (Third) of Torts: Products Liability were Professors James A. Henderson, Jr. (Cornell Law School) and Aaron D. Twerski (Brooklyn Law School). *See* Restatement (Third) of Torts: Products Liability at XVII. In 1998, these distinguished scholars were lauded by Professor Geoffrey C. Hazard, Jr., then Director of the ALI, who noted that the ALI's Executive Committee had designated them "as joint holders of the R. Ammi Cutter Reporter's Chair, an honor reserved for [ALI] Reporters whose service is regarded as especially outstanding." *Id.* at XVI.

¶ 108. In 2005, Professors Henderson and Twerski penned an article answering Professor Ellen Wertheimer's critique of Restatement (Third) of Torts: Products Liability. *See* Henderson & Twerski, *supra.* In the course of that article, the professors observed that "Wisconsin has long been the lone star state in our products liability law, marching to its own, sometimes quite peculiar, drummer." *Id.* at 940.

¶ 109. The lead opinion restates Wisconsin's peculiar position on alleged design defects without mustering the intellectual firepower to defend it. Wisconsin has every right to stand alone, but it should not do so unless its singular approach can be supported objectively and defended as sound.

¶ 110. In this case, the court should acknowledge that the law has evolved and adopt Restatement (Third) of Torts: Products Liability § 2(b) to analyze products liability claims alleging defective design. Other features of Restatement (Third) should be considered in appropriate cases another day.

145

¶ 111. For the reasons stated, I respectfully concur.

¶ 112. I am authorized to state that JUSTICE ANNETTE KINGSLAND ZIEGLER and JUSTICE MICHAEL J. GABLEMAN join this concurrence.